NEW JERSEY BELL TELEPHONE COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT, v, STATE OF NEW JERSEY, DEPARTMENT OF PUBLIC UTILITIES, BOARD OF PUBLIC UTILITY COMMISSIONERS, RESPONDENT.

Argued May 11, 1953—Decided June 15, 1953.

570

572

*Messrs. Thomas Glynn Walker* and *Duane E. Minard, Jr.,* argued the cause for the appellant.

*Mr. Joseph Harrison,* Special Deputy Attorney-General, argued the cause for the respondent (*Mr. Jacob Schwartz,* of counsel; *Mr. Edward S. Binkowski,* Deputy Attorney-General, on the brief; *Mr. Theodore D. Parsons,* Attorney-General of the State of New Jersey, attorney).

The opinion of the court was delivered by

BURLING, J. This is a public utility rate case. The New Jersey Bell Telephone Company, a corporation of the State of New Jersey (hereinafter adverted to as the Company), appeals from two determinations of the Board of Public Utility Commissioners, Department of Public Utilities, State of New Jersey (hereinafter called the Board). The first of the orders appealed from is the Board's decision and order of August 15, 1951 denying the Company an increase in intrastate rates; the second is the Board's order of September 18, 1952 denying the Company's petition for rehearing in this matter.

The present proceedings were induced by the Company's filing with the Board on April 20, 1950 new rates schedules proposed to become effective May 21, 1950. The net result of these proposed tariff changes was estimated by the Company to produce at least $9,800,000 in additional annual gross intrastate revenues.

Two earlier efforts by the Company to increase rates had been successful. The Company introduced in evidence in the present proceedings the decision and order of the Board with respect to each of these earlier rate increases and the same. are to some extent interrelated in the determination now under review.

The first of these prior orders related to proceedings for increased rates initiated before the Board by the Company in 1947. The Board by order of November 25, 1947 had held that the schedule of increased rates then filed by the Company was excessive and therefore "unjust and unreasonable," but had allowed a revised schedule of rates designed to produce an increase in annual intrastate operating revenues of $10,515,000 to result in an annual net intrastate operating income of $8,347,000. The Board found the Company's rate base to be $149,045,000 and that the rate of return thereon under the tariff increase allowed would be 5.6%. This rate the Board held would constitute a fair rate of return at that time.

The second of the above mentioned prior orders of the Board related to proceedings concerning increased intrastate rates proposed by the Company and subsequently made subject to hearings before the Board in 1948. The Board by order of April 11, 1949 had held that the schedule of rates then proposed by the Company was unjust and unreasonable in that it would yield an excessive return but that a schedule of rates that would increase annual intrastate operating revenues by $8,305,000 was just and reasonable. It again determined the rate base, in the amount of $178,000,000, and determined that a fair rate of return thereon would be 5.6%.

The Company appears to have filed no appeal from either the November 25, 1947 or the April 11, 1949 decision and order of the Board.

The present proceedings, as hereinbefore stated, had their inception in the filing of the Company's new proposed tariff increases on April 20, 1950, to be effective May 21, 1950. On April 26, 1950 the Board ordered a hearing thereon and

ordered that the effective date of the proposed schedules (May 21, 1950) be suspended until August 21, 1950. The Board on August 2, 1950 ordered the further suspension of the proposed rates to November 21, 1950. On August 24, 1950 the Company filed a stipulation with the Board voluntarily consenting to stay of· operation of the proposed rates to January 20, 1951. Additional stipulations extending the suspension of the rates were filed on January 18, 1951, April 19, 1951 and June 18, 1951.

On August 15, 1951 the Board filed its decision and order. It held that the existing rates were not unjust, unreasonable or insufficient, and that the proposed rates were unjust and unreasonable. Accordingly it denied the rate increase sought by the Company. The Board found the intrastate rate base to be $255,836,000; it adjusted operating expenses (which as estimated indicated a rate of return of 6.07%) and found the rate of return after adjustment to be 6.37%. This rate of return it found "clearly not insufficient."

On August 29, 1951 the Company filed with the Board a petition for rehearing. In this petition the Company argued that the evidence it had submitted on its rate base during the course of the 1950-1951 proceedings should be reconsidered. It sought in addition to supplement that evidence and to introduce "current" evidence of changed conditions and of the "imminence of the imposition of higher tax rates by Congress and the continuing increase in other elements of cost." The Company did not detail the items of decision which it contended constituted material error.

On April 18, 1952 the Company requested that its petition for rehearing be granted. The Board on April 29, 1952 by letter suggested to the Company that it supplement the petition for rehearing filed August 29, 1951. Accordingly on May 5, 1952 the Company filed with the Board a "Supplement to Petition for Rehearing" asserting further changed conditions and seeking additional increase in gross revenue, namely $4,406,000.

A hearing before the Board was held on May 21, 1952. This hearing was confined to argument as to whether a re-

hearing should be allowed the Company. The Company's petition was resisted by intervenors, namely, the United States Government and the City of Perth Amboy.

Subsequently on June 11, 1952 the Board ordered further information to be furnished it in affidavit form by the Company. This order was complied with on June 13, 1952. Thereafter on September 18, 1952 the Board filed its order denying the Company's petition and supplemental petition for rehearing. It appears that this order was issued by the Board on September 20, 1952.

The Company served and filed its notice of appeal (from the Board's orders of August 15, 1951 and September 18, 1952) to the Superior Court, Appellate Division, on October 6, 1952. The Attorney-General acting for the State as respondent moved to dismiss the appeal. Decision on the motion was reserved by the Superior Court, Appellate Division, pending argument of the appeal. Prior to hearing there, certification was allowed on our own motion, after the matter was opened to the court by petition of the State in its individual capacity as a respondent. The State as such respondent at the same time renewed its motion to dismiss the Company's appeal. The motion to dismiss the appeal was denied.

## THE QUESTIONS INVOLVED

On the appeal there are many questions involved. Tersely, these questions relate to the adequacy and validity of the findings of the Board concerning the three principal factors in utility rate determination, namely rate base, income and expenses, and rate of return. The detail of these questions will be treated separately in this opinion under discussion of the pertinent factors.

It suffices at this point to state that our examination of the record and consideration of the pertinent principles of law results in affirmation of the Board's orders of August 15, 1951 and September 18, 1952.

### The Appeal

In view of the novelty of the questions relative to the Board's order denying the Company's application for rehearing, we move first to the disposition of that portion of the appeal.

### I.

### The Denial of Rehearing

The questions involved on the phase of the appeal dealing with the Board's order of September 18, 1952, denying the Company's petition for rehearing may be summarized as follows:

(a) Did the Board abuse its discretion in denying the petition for rehearing on the original evidence and determination?

(b) Did the Board abuse its discretion in denying the petition for rehearing insofar as changed conditions were asserted therein?

That the Board has authority to order a rehearing is substantiated by *R. S.* 48:2–40, which provides that "The board at any time may order a rehearing and extend, revoke or modify an order made by it." *Cf. Central R. Co. of N. J. v. Dept. of Pub. Utilities,* 7 *N. J.* 247, at 254–255 (1951). This statutory provision is a rule of the Board within the contemplation of *Rule* 1:2–6(*d*) adopted June 7, 1951. *Cf. Borough of Jamesburg v. Hubbs,* 6 *N. J.* 578, 584 (1951). It is a legislative recognition of the principle that unless qualified by statute the right to order a rehearing is inherent in administrative tribunals, expressed by Mr. Justice Heher for this court in *Handlon v. Town of Belleville,* 4 *N. J.* 99, 106–107 (1950).

The general rule with respect to allowance of rehearing is stated in the *Handlon* case, *supra,* to be qualified by the requirement for the exercise of reasonable diligence. *R. S.* 48:2–40, *supra,* expresses the legislative purpose to enlarge this inherent power of the Board to permit it to allow a

rehearing "at any time." *Central R. Co. of N. J. v. Dept. of Pub. Utilities, supra* (7 *N. J.*, at *pp.* 254–255). However, this would not have permitted the Board to grant a rehearing after the allowance of a writ of *certiorari* (pending determination thereon) under the former procedure relating to resort to the writ for review of the Board's orders. *R. S.* 48:2–43. Nor does it affect the course of review ordained by this court under our constitutional mandate. The pertinent portion of *N. J. Const.* 1947, *Art.* VI, *Sec.* V, *par.* 4, provides:

"Prerogative writs are superseded and, in lieu thereof, review, hearing and relief shall be afforded in the Superior Court, on terms and in the manner provided by rules of the Supreme Court, as of right, * * *."

The procedure for review in the present case, within the constitutional requirement, is provided by Rules 3:81–8, 1:2–5 and 1:2–6(*d*), *supra. Cf. Central R. Co. of N. J. v. Dept. of Public Utilities, supra* (7 *N. J.*, at *pp.* 257–259). Consistently therewith the appeal from the August 15, 1951 order of the Board was required to be made within 30 days of the service thereof on the Company, since at the time of the order *Rule* 1:2–5(*f*) applied. (The present *Rule* 1:2–5(*b*), effective January 1, 1952, provides a 45-day period applicable to agency decisions entered after that date.) The filing of a timely petition for rehearing with the Board, however, tolls the time for appeal, *Rule* 1:2–6(*d*), *supra*, if the petition is filed within the time for appeal. In the present matter the Company's petition for rehearing was filed on the 14th day after the date of the Board's original decision but on the 13th day after service of the decision on the Company, the controlling date under former *Rule* 1:2–5(*f*) *supra.* (*Cf. Rule* 1:2–5(*b*) now in effect). There then remained 17 days within which to file an appeal from the order of August 15, 1951. This remaining time again began to run from the date of the decision denying the rehearing. The date of actual decision was September 18, 1952, and computation of time under *Rule* 1:2–5, *supra*, would indi-

cate that the last day for the filing of the notice of appeal was October 5, 1952. However, since October 5, 1952 was a Sunday, the filing on October 6, 1952 was timely. *Rule* 1:7–8. We need not consider whether the "date of a decision denying" rehearing, *Rule* 1:2–6(*d*) *supra*, is the date of *service* of the decision (in this case, September 20, 1952) as argued by the Company.

The Company's petition for rehearing was itself timely under *R. S.* 48:2–40, *supra*. It was equally timely within *Rule* 1:2–6(*d*), *supra*, for it was filed within the time allowed by *Rule* 1:2–5, *supra*, for appeal. *Cf. Albertson v. F. C. C.*, 87 *U. S. App. D. C.* 39, 182 *F. 2d* 397 (*App. D. C.* 1950); *Saginaw Broadcasting Co. v. F. C. C.*, 68 *App. D. C.* 282, 96 *F. 2d* 554 (*App. D. C.* 1938); *Southland Industries, Inc., v. F. C. C.*, 69 *App. D. C.* 82, 99 *F. 2d* 117 (*App. D. C.* 1938).

It was asserted by the State as an individual respondent that the Board's delay in reaching its decision denying the Company's application for rehearing was too greatly removed from the date of the original decision and therefore the Company's appeal was not timely. This is without merit in view of *Rule* 1:2–6(*d*), *supra*.

█ The Company's petition for rehearing, regardless of its merits, was addressed to a review of the findings and conclusions stated by the Board in its original decision of August 15, 1951. The Company was within its rights in applying for rehearing.

██ A rehearing is not essential to due process of law. In *Pittsburgh, C. C. & St. L. R. Co. v. Backus*, 154 *U. S.* 421, 426–427, 14 *S. Ct.* 1114, 38 *L. Ed.* 1031, 1036 (1894), the United States Supreme Court held, in reviewing an appeal from a state supreme court judgment upholding a state tax board determination:

"* * * Rehearings, and new trials, are not essential to due process of law, either in judicial or administrative proceedings. One hearing, if ample, before judgment, satisfies the demand of the constitution in this respect."

Further it has been repeatedly declared by the United States Supreme Court that rehearings before administrative bodies are addressed to their own discretion and only a showing of the clearest abuse of discretion could sustain an exception to that rule. *Radio Corp. of America v. United States,* 341 *U. S.* 412, 420–421, 71 *S. Ct.* 806, 95 *L. Ed.* 1062, 1071 (1951); *United States v. Pierce Auto Freight Lines,* 327 *U. S.* 515, 534–535, 66 *S. Ct.* 687, 90 *L. Ed.* 821, 834–835 (1946); *Interstate Commerce Commission v. Jersey City,* 322 *U. S.* 503, 514–519, 64 *S. Ct.* 1129, 88 *L. Ed.* 1420, 1428–1431 (1944).

These general principles are supported by the pertinent statutory provisions. In *Central R. Co. of N. J. v. Dept. of Pub. Utilities, supra* (7 *N. J.*, at *pp.* 254–255), this court held:

"* * * the legislative intent to require final disposition of initial rate proceedings within a maximum six months period is evident. On the other hand, it is equally evident that the Legislature intended no bar to further hearings on the same subject matter, for the Board is authorized to investigate upon its own initiative or upon complaint in writing any matter (which would necessarily include fares) concerning any public utility, *R. S.* 48:2–19, *supra,* and at any time to order a rehearing and extend, revoke or modify an order made by it, *R. S.* 48:2–40, *supra.* The comprehensive legislative design is one of continuous supervision, with a mandate to the Board to resolve initial investigations, expeditiously, and yet granting to it concomitant authority to institute corrective proceedings and especially where experience furnishes evidence of failure of an earlier order to accomplish its. intended purpose.

We find no fault with the action of the Board in initiating a rehearing. * * *"

In the present case the Company's petition for rehearing, insofar as it related to the evidence considered by the Board and the Board's decision and order (dated August 15, 1951) emanating therefrom, appears merely to have reiterated the Company's disagreement with the Board's treatment of the evidence generally. It contained no clear indication of the nature of the "material errors" the Company alleged were apparent in the Board's decision. Viewed in the light of

that circumstance alone, the Board's denial of the petition for rehearing was within their discretion. Compare *Public Service Coordinated Transport v. State, supra* (5 *N. J.,* at *p.* 226).

The Company asserts, however, that the Board was required to allow its petition for rehearing upon the Company's allegations of changed circumstances. In so contending the Company attempts to draw support from the above-quoted portion of our opinion in the *Central R. Co.* case, *supra* (7 *N. J.,* at *pp.* 254–255). The rehearing there was granted by the Board within its independent discretion to initiate rehearing. It· was not held that the statute constituted a mandatory direction to the Board to allow a rehearing, and nothing in the statute may be so construed.

It is settled that the statute provides in the continuing supervisory power of the Board a wholly adequate means for close supervision of public utility rates and for the correction of inequities and adjustment to shifting circumstances. *Central R. Co. of N. J. v. Dept. of Pub. Utilities, supra; Atlantic City Sewerage Co. v. Board ·of Public Utility Commissioners,* 128 *N. J. L.* 359, 367 (*Sup. Ct.* 1942), affirmed 129 *N. J. L.* 401 (*E. & A.* 1943). However, the authority to allow rehearings does not constitute unlimited sanction for an indiscriminate grant of rehearings by the Board, nor a method for circumvention of the orderly statutory procedures for initiating rate ·hearings, ·detailed in *R. S.* 48:2–19 and *R. S.* 48:2–21. Where the petition for rehearing seeks to reopen the matter for the purpose of introducing evidence of changed circumstances, the Board's action in allowing or denying the rehearing is discretionary and may be set aside only for abuse of the delegated legal discretion. *Cf. Grogan v. DeSapio,* 11 *N. J.* 308, 321 (1953) ; *Reid Development Corp. v. Parsippany-Troy Hills Tp.,* 10 *N. J.* 229, 237 (1952). The following expression of this court in *In re New Jersey Power & Light Co.,* 9 *N. J.* 498, 527 (1952), may be adapted here to emphasize the letter and spirit of the statute in this respect:

. "* * * Where by reason of circumstances beyond the control of the Utility and unforeseeable at the time of the rate order it becomes apparent that the existing rates are insufficient to provide a fair rate of return, and rates reasonable · both to the public utility and the public, *the remedy is not by way of invalidation of the past order on the basis of the subsequent events* * * * *but by way of filing new schedules of rates in accordance with the statutory* requirements." (Emphasis supplied.)

The Company's original petition for rehearing was timely, as hereinbefore determined. This in itself does not mean that the denial of rehearing constituted an abuse of discretion on the part of the Board. If the Company's allegations of changed conditions were true, then the evidence introduced in the hearings antedating the rate order of August 15, 1951 may have been so obsolete by September 18, 1952, as to be rendered worthless as a basis for a determination at that time of rate base, operating expenses or rate of return. The delay in moving the petition for rehearing multiplied the difficulties of the Board, and the task of the appellate court now called upon to review the original rate order of August 15, 1951 some 2½ years after the proceedings were initiated and over 1½ years after the decision of the Board. Such delay where the statute clearly provides an admonition to the Board to determine a rate case within six months from its inception is not fair to the public and may in some instances result in loss of revenues to the public utility involved. In the present case, however, the Company itself materially contributed to the delay for it allowed eight months to pass before it requested the Board to take action on its petition for rehearing. Neither the Company nor the Board explained that delay when queried thereon by this court on the oral argument of this appeal. Under these circumstances and the fact that the Company at any time could have filed new schedules under *R. S.* 48:2–21, *supra,* the denial of rehearing by the Board cannot be characterized as prejudicial to the Company. This does not prejudice the Company's right to introduce in a new rate hearing any evidence of changed circumstances after the original rate order of August 15, 1951. There was no hearing on the

merits relating to such subsequent events and factors. Orderly administration of justice requires adherence to definite principles. If the Company believes itself prejudiced by delay, it has only to recollect that at no time since August 15, 1951 has it been deprived of its statutory right to file new schedules except by its own conduct.

The Board's order of September 18, 1952, denying the Company's petitions for rehearing, is affirmed.

## II.

### THE ORIGINAL DENIAL OF INCREASE IN RATES

The questions involved on the phase of the appeal dealing with the Board's order of August. 15, 1951, denying the Company an increase in rates, are numerous. They assert deficiency or error in the Board's determinations concerning each of the three major factors upon which the reasonableness of rates is determined, namely rate base, income and expense, and rate of return. Each of these three major factors is hereinafter considered in detail.

### A. RATE BASE

The general question involved relating to rate base is whether the Board's decision was in accord with established legal principles and based upon evidence properly considered and evaluated.

(1) *Formulae.*

The Company contends that the Board completely ignored the allegedly substantial evidence introduced at the hearings in relation to reproduction cost of its plant. It appears from the record that the Company introduced evidence as to its average net investment (an historical cost rate base), as to cost of reproduction less existing depreciation (a reproduction cost new rate base), and expert testimony as to present fair value. The Board determined that the evidence indicated that the expert gave cost of reproduction a weight-

ing of approximately 2/3 and actual (historical) cost a weighting of 1/3 in arriving at his opinion of fair value.

It is necessary only to reiterate that the settled law of this State is that there are a number of formulae useful in determination of fair value of a utility's property for use as a rate base and that *the Board is not and should not be bound by any simple formula or combination of formulae.* *Public Service Coordinated Transport v. State, supra* (5 *N. J.,* at *p.* 217); *In re New Jersey Power & Light Co., supra* (9 *N. J.,* at *p.* 510). It follows that the Board's determination may not be set aside merely because it did not fully adopt any one of the specific formulae used by the Company in presenting its evidence on rate base.

(2) *The Burden of Proof.*

It is now firmly established that the statutory and decisional law in this State requires the utility to bear the burden of proving the reasonableness of proposed rate increases. *R. S.* 48:2–21(*d*); *Central R. Co. v. Bd. of Pub. Utility Com'rs.,* 10 *N. J.* 255, 262 (1952), appeal dismissed 345 *U. S.* 931, 73 *S. Ct.* 794, 97 *L. Ed.* —— (1953); *In re New Jersey Power & Light Co., supra* (9 *N. J.,* at *p.* 509); *Central R. Co. of N. J. v. Dept. of Pub. Utilities, supra* (7 *N. J.,* at *pp.* 255–256); *Public Service Coordinated Transport v. State, supra* (5 *N. J.,* at *p.* 219); *Atlantic City Sewerage Co. v. Board Pub. Utility Commissioners, supra* (128 *N. J. L.,* at *p.* 369). The Company recognizes this but contends that the Board completely disregarded all its evidence of reproduction cost with its attendant proofs as to current economic conditions.

(3) *Reproduction Cost Evidence.*

It is true that the Board must determine the rate base at the fair value of the property of the public utility that is used and useful in the public service at the time of its employment therein, by viewing the plant as an integral and unitary whole, considering all the elements properly entering into the ascertainment of a reasonable return for supplying the public need. *In re New Jersey Power & Light Co., supra* (9 *N. J.,* at *p.* 509); *Public Service*

*Coordinated Transport v. State, supra* (5 *N. J.*, at *p.* 217);
*Atlantic City Sewerage Company v. Bd. Pub. Utility Com'rs.,
supra* (128 *N. J. L.*, at *pp.* 365, 366). However, there is
no requirement that the rate base be coupled directly to cost
of living indices or current costs in material and labor mar-
kets. The pertinent standards in this respect have been
detailed by this court in the matter of *In re New Jersey
Power & Light Co., supra* (9 *N. J.*, at *pp.* 516–517). It is
evident from the record that at the time of the rate decision
in the present case over 60% of the Company's gross plant
investment had been made during the period 1946-1951 and
therefore reflected post-war price and labor levels. *Cf. In re
New Jersey Power & Light Co., supra* (9 *N. J.,* at *p.* 524).
While this is not a controlling feature it is a factor which
was properly considered by the Board.

 Cost of reproduction is a guide, but not a measure.
*Dayton P. & L. Co. v. Public Utilities Commission*, 292 *U. S.*
290, 311, 54 *S. Ct.* 647, 78 *L. Ed.* 1267, 1281 (1934). There
are features of the case which are adverted to by the parties
to the appeal as indicia of the weight to be accorded the
reproduction cost evidence.

The Company introduced evidence that the value of its
land separate from its buildings (*i. e.*, as unimproved land)
was $2,097,352, whereas book (original cost) value, as in-
cluded in the rate base determined by the Board, was
$4,566,545, which was in favor of the Company.

 With respect to mass items such as poles, cables and
stations, the Company asserts that its proofs of reproduction
cost were uncontradicted. The proofs consisted of the taking
of book quantities and multiplying these by current unit costs
of labor and materials for wholesale construction "con-
sistent with the Company's own experience" and the ex-
perience of other utilities. Although the Company's account
records are not to be accepted at face value with respect to
evaluation, *Public Service Coordinated Transport v. State,
supra* (5 *N. J.*, at *p.* 218), property records seem to be the
only practical source of information as to inventory of a
statewide utility other than annual reports filed with the

Board. Both the continuing property count of the Company as to these mass items and its annual filed reports were introduced in evidence in this case and seem adequate to prove the quantities in use of this category of plant in service under either rate base evaluation formula. *Cf. In re New Jersey Power & Light Co., supra* (9 *N. J.*, at *pp.* 524–525). However, as was held in that case (9 *N. J.*, at *pp.* 518–519), there is a danger and injustice to the public in basing a fair value determination on reproduction cost *new* of obsolete or obsolescent facilities by adjusting actual cost to the current purchasing power of the dollar. The net result of the Company's evaluation procedure with respect to these mass items appears to have been properly subjected to criticism by the Board in this respect.

With respect to buildings and central office equipment the Company repeats its assertion that its evidence was uncontradicted and should have been accepted by the Board. These categories of property were valued by the Company's witnesses "with the aid of special index numbers" based on the results of computations by experts in part derived from relative costs prevailing in Newark, Trenton, Camden and Atlantic City. The Company also introduced testimony to the effect that a substantial part of the cost of additions to plant was excluded to eliminate increased cost due to piecemeal construction and that one-fourth of major post-war construction was excluded to allow for contractors' inefficiencies.

 The opinion evidence submitted by the Company as to buildings and central office equipment was in itself contradictory in that the experts were not in accord in several respects. This was commented upon by the Board in rendering its decision. The Company urges that the controlling principle in this respect is that mere differences in opinion evidence are insufficient to warrant complete rejection thereof. *Illinois Bell Tel. Co. v. Illinois Commerce Commission*, 414 *Ill.* 275, 111 *N. E.* 2d 329, 337 (*Sup. Ct.* 1953). While this may be true, it is settled that mathematical calculations in appraisals, though made in the best of

faith, can lead to divergent results and should be closely scrutinized. *Aetna Life Insurance Co. v. City of Newark,* 10 *N. J.* 99, 106 (1952). Much of the opinion evidence in the present· case included hypothetical factors derived by mathematical calculations based upon other experts' hypothetical conclusions. The reproduction cost evidence in this case was studied carefully by the Board, as is demonstrated by the detail with which it expressed itself in its decision.

The Company placed its principal emphasis on appeal upon the fair value estimates of Mr. Maynard A. Cook, member of a Chicago firm of consulting engineers. The Board found Mr. Cook's testimony and his charts and other prepared data of little weight. Mr. Cook was the principal witness for the Company with respect to depreciation. It is his studies of fair value, *i. e.*, reproduction cost new less depreciation, that constitute the keystone of the Company's case. As an example of the deficiencies of the evidence thus adduced, the Board in its decision observed that Mr. Cook excluded a review of ratings applied to the Company's poles installed prior to 1930, 22.9% of the total, admitted by the Company to be the oldest in the system. The Board also observed that Mr. Cook admitted that he was not familiar with the Company's specifications for pole lines. The Board further pointed out that Mr. Cook relied on studies prepared by Mr. Damon G. Douglas, a Newark construction engineer, as to building depreciation. Mr. Douglas estimated ·the life of each component of the buildings he appraised only as to physical deterioration, and not as to functional obsolescence. His calculations included many variables and resulted in the application of different factors to component parts of buildings, for example: skeleton—400 years (steel or reinforced concrete) or 200 years (wall-bearing structures); exterior masonry—200 years; interior masonry and partitions—200 years; roofing—100 years; plumbing and electrical work—80 years; heating and ventilating equipment— 60 years; elevators—50 years. The Douglas estimates were themselves dissected by the Board and found unreliable. As for obsolescence, Mr. Cook appears to have made no inde-

pendent study but to have relied upon information given him by the Company. The Company does not attack these findings and they are grounded in the evidence. Other minor criticisms of Company experts made by the Board are objected .to by the Company. These minor criticisms are supported by the evidence. Even so, they do not have the controlling effect attributed thereto by the Company.

In respect to depreciation it is observed that upon the original cost basis the Board used the depreciation reserve as a factor in reaching its rate base determination. This was not raised by the Company as a question involved, and at oral argument was admitted by the Company to be unobjectionable to it. Further, the evidence indicates that the Company had cooperated in the formulation of the depreciation rates which had been approved by the Board. It is to be noted (in comparison with the Douglas estimates hereinabove adverted to) that included in the schedule of depreciation rates approved by the Board are annual depreciation rates as to buildings, based upon an average service life of 35 years.

██ Although reproduction cost is evidential, the proofs in support thereof must be clear enough to establish the opinion beyond mere conjecture. See *Colorado Interstate Gas Co. v. Federal Power Comm.*, 324 *U. S.* 581, 604, 64 *S. Ct.* 829, 89 *L. Ed.* 1206, 1224 (1945). We are unable to agree with the Company that the Board has applied a "reproduction of service" test to the Company's reproduction cost testimony. *Cf. In re New Jersey Power & Light Co., supra.* A forecast as to the reasonableness of rates necessarily involves a forecast relating to the usefulness of the Company's property in the public service, and such was given consideration by the Board.

(4) *Materials and Supplies.*

Included in the questions involved in this appeal in the rate base category is the Company's contention that the Board erred in reducing its claimed allowance for materials and supplies by $716,000. The Board reached its conclusion in this respect, *inter alia*, by discrediting the total amount

so claimed by the Company on the grounds of delay in payments, of the fact reusable materials are carried in this account at current prices new, and of the fact that an allowance of three months' requirements would be generous. The Company contends that these are not valid reasons to support the disallowance. It argues that this is a matter of internal management with which the Board may not interfere.

It has been held that a public utility board has no power to dictate policy for a utility company unless the latter's policy is inimical to public interest. See *Elyria Tel. Co. v. Public Utilities Commission*, 158 *Ohio St.* 441, 110 *N. E.* 2d 59, 63 (*Sup. Ct.* 1953). Compare *Passaic, etc., Water Co. v. Board of Public Utility Comm.*, 5 *N. J. Misc.* 1078, 1081–1082 (*Sup. Ct.* 1927), affirmed 104 *N. J. L.* 666 (*E. & A.* 1928). However, it has been held that the time within which the property of this category will be used is "very important" in determining whether this property (held for future use) should be included in the rate base, and the test is whether the time for using the property in question is so near that it may properly be held to have the quality of working capital. *Petition of New England Tel. & Tel. Co.*, 115 *Vt.* 494, 66 *A.* 2d 135, 142–143 (*Sup. Ct.* 1949). *Cf.* 2 *Pond, Public Utilities* (1932), *sec.* 567, *p.* 1040. This appears to be a reasonable test and to have been applied by the Board in this case. There is a presumption in favor of the validity of the action of the Board since its exercise of the rate-making power involves a broad measure of legislative discretion. "Agencies to whom this legislative power has been delegated are free, within the ambit of their statutory authority, to make the pragmatic adjustments which may be called for by particular circumstances." *Atlantic City Sewerage Co. v. Bd. Pub. Utility Comm'rs., supra* (128 *N. J. L.*, at *p.* 368). We find no abuse of discretion on the part of the Board in this respect. Further, we find that the Company's own evidence on this facet of the rate base calculations called for an allowance of $2,524,500. The Board allowed $2,600,000.

In summary, we determine that the Board studiously

analyzed all the evidence relative to rate base and the component elements thereof. Its conclusion as applied to the facts before it has evidential support, and viewed in its entirety produces no arbitrary result. The emphasis placed by the Company· on the allegation that reproduction cost was ignored is not so. The reproduction cost evidence substantiates the original cost figure as to plant additions effected in the post-war period. Both proposed rate-base methods involved consideration of the same evidence. As the Board found, Mr. Cook based his fair value estimate on both original and reproduction cost. It was a matter of legislative judgment delegated to the Board acting within that sphere to assay the fitting weight to be accorded all the evidence.

## B. INCOME AND EXPENSES

The questions involved in this appeal under this category relate principally to expenses. The Company contests disallowances of several expense items, arguing that amounts actually paid must be allowed unless there is an abuse of discretion on the part of the Company's officers. The Board relied upon the rule that it is not permitted to take the Company's books of account at face value.· See the *Public Service Coordinated Transport* case, *supra* (5 *N. J.*, at *p.* 218–219).

(1) *License Contract.*

The Company contends that· the Board erred in failing to allow the whole of its payments to its parent corporation, American Telegraph & Telephone Company, under a license contract made between the Company and American in 1930.

The general principle applicable to this phase of the case is that the regulatory body may disallow such part or parts of the payments made by the regulated company to a parent or affiliated corporation as may exceed costs reasonably incurred by the parent or affiliate in rendering services to the state regulated company. See the *Public Service Coordinated Transport* case, *supra* (5 *N. J.*, at *p.* 222); *Smith v.̇ Illinois Bell Tel. Co.*, 282 *U. S.* 133, 151–157, 75 *L. Ed.* 255,

264–268 (1930). The validity of the contract as between the affiliated corporations is not in question, nor is the obligation thereof impaired by the disallowance. The determination of the Board merely relates to the *portion* of the expenses to be borne by the New Jersey consuming public. *Cf. Columbus Gas & Fuel Co. v. Public Util. Com.*, 292 *U. S.* 398, 414, 54 *S. Ct.* 763, 78 *L. Ed.* 1327, 1336–1337 (1934). *Cf. Lindheimer v. Illinois Bell Teleph. Co.*, 292 *U. S.* 151, 157–165, 54 *S. Ct.* 658, 78 *L. Ed.* 1182, 1188–1192 (1934).

The Company claimed an allowance of $1,212,700 to cover payments to American under its license contract (which calls for payment to American of 1% of the Company's gross annual revenues). The Board reduced the amount of this item by $387,000, after making specific findings as to the failure of proof of reasonableness of the allocation of certain costs of American to the Company.

The Board contends on this appeal that no allowance under the license contract is warranted until the Company has obtained the Board's approval thereof under *R. S.* 48:3–7.1. The Company contends that the statutory provision has no application, although amendments of the contract have been made by American since the enactment of the statute in 1930. We find no necessity to resolve the opposing contentions concerning the applicability of this statute and the apparent failure of the Company to act thereunder subsequent to the Board's decisions in the 1947 and 1949 rate cases in which its treatment of this particular paralleled the treatment accorded it in the decision in the present case. The reason for this is that in any event the determination for rate purposes requires proof of reasonableness of the payments made by the Company to American for services rendered to the Company. See the *Smith* and *Lindheimer* cases, *supra*. Compare *Michigan Bell Tel. Co. v. Michigan Public Service Commission*, 332 *Mich.* 7, 50 *N. W. 2d* 826, 833–835 (*Sup. Ct.* 1952). Proof of this nature was introduced by the Company and was considered by the Board in reaching its determination in the present matter.

(2) *Service Pension Accruals.*

The Company contends that although the Board properly allowed its full claim ($4,298,000) for other payments to its pension trust fund as operating expenses, it erred in disallowing 50% of a so-called "freezing charge," a payment into the pension fund to decrease unfunded actuarial reserve. The amount so claimed was $328,000. The Board allowed $164,000. The Company contends that these payments are essential to actuarial soundness of its pension fund, and there was evidence introduced which supports this contention. The Board held that although the amount of the payment was proved and the Company had to pay the "freezing charge," it was unreasonable to assess the full charge against the consumers. The Board came to its conclusion upon the finding that the actuarial reserve requirement of the pension plan had doubled since 1928 when the Company completed its transition of pension payments to a funded pension trust.

The testimony in the record of the proceedings in this matter shows that the Company was not formed until 1927, but its predecessor companies and other Bell companies elsewhere first adopted pension plans in 1913 which, with subsequent amendments, continued in operation thereafter and as to the Company are incorporated in its present pension plan. This plan is the same as that in effect in other Bell system companies elsewhere. The plan involves a pension trust fund to which the Company makes periodic payments to keep the fund adequate for pensions. The trustee pays pensions out of the fund; the balance of the fund is invested and the earnings augment the fund. If the pension plan were terminated the funds therein would be used only for the payment of pensions on a priority basis. At the end of 1949 the amount in the fund was $36,286,994.51. It was testified that the fund is sufficient to pay current pensions and pensions of employees presently entitled to retire.

From 1913 to 1926, inclusive, "pensions were handled on a pay-as-you-go basis" but data for actuarial studies was collected. In 1927 the Company and other Bell companies

adopted an actuarial accrual program for pensions. At that time pension reserves were more than adequate to pay then current pensions. There is testimony in the record to the effect that a full accrual plan would have made a sharp increase over the cost of the pay-as-you-go plan. The particulars of the three-step limited accrual plan adopted were recited by Company witnesses in considerable detail. The second step was invoked in 1928 and the third step (now in operation) was placed in effect in 1941. It was testified that in 1941 the pension fund "was more than sufficient to provide for pensions granted before 1941 and for those payable to employees who were then entitled to retire on a pension at their own request."

The plan before 1941 made no provision for "the so-called unfunded actuarial reserve requirement" which is computed to secure the cost of pensions to be granted in the future. In 1928 the unfunded portion of this computed actuarial reserve requirement was $7,732,322, and on December 31, 1940 it had risen to $16,223,063. The testimony showed its current status at the time of the hearing before the Board to be $14,230,000. There was further testimony to the effect that the Company's method of reduction of this unfunded reserve requirement by payment of the "freezing charge" was reasonable and essential.

The Board points to no evidence in the record to support its conclusion that the Company failed to take necessary steps between 1928 and 1941 to arrest the growth of the actuarial unfunded reserve requirement. On the other hand, the Company relies on opinion evidence for proof that the *amount* of the "freezing charge" currently made to increase the funded portion of the actuarial reserve is essential. The question seems to resolve itself to whether the Board, on the evidence, properly exercised its discretion in determining the *reasonableness* of this Company account.

There must be a distinction between what was said and what was done. The Company may not prevail on appeal unless there has been error in the result as well as the reasoning, and it must bear the burden of proving the

same. *Dayton P. & L. Co., v. Public Utilities Commission, supra*, 292 *U. S.* 290, 54 *S. Ct.* 647 (78 *L. Ed.*, at *page* 1274). The result here essentially is that the Company failed to carry the burden of proving the reasonableness of this item. That the Board so found is unmistakable. We are not of the opinion that the record requires a contrary finding.

It must not be understood from our conclusion, however, that we agree with the Board's reasoning. Both the reasons asserted by it were held insufficient to justify a *complete* disallowance of a similar "freezing charge" in *Petitions of New England Tel. & Tel. Co.*, 116 *Vt.* 480, 80 *A. 2d* 671, 677–683 (*Sup. Ct.* 1951). The logic of the Vermont Supreme Court's opinion appeals to us as a proper appraisal of the allowance of this type of charge as an operating expense in a rate case. Comparable factors must necessarily have impressed the Board in the present matter, for it allowed 50% of the claimed item as an operating expense. *Cf. City of Pittsburgh v. Pennsylvania Public Util. Comm.*, 370 *Pa.* 305, 88 *A. 2d* 59, 65–68 (*Sup. Ct.* 1952).

The Board argues on this appeal that its decision and order should be sustained because in other cases (in other jurisdictions) "mention" was made of the "very well known fact that the A. T. & T. Comptroller, as well as its consulting actuary, both recommended the commencement of action that would tend to freeze the unfunded actuarial liability as far back as 1927 and 1928." This argument is ungrounded in law, exceeding the logical bounds of judicial notice. Evidence of this "fact" in the record of this case is not adverted to and appears to be nonexistent. It can have no bearing on our determination. Compare the *City of Pittsburgh* case, *supra* (88 *A. 2d*, at *pages* 65–66).

(3) *Charitable Contributions.*

The Company questions the propriety of the Board's disallowance as an operating expense an item of $77,300, charged to charitable contributions. The Board found that it was unreasonable to require the consumer to pay for such expense.

The Company contends that charitable contributions by corporations are authorized business expenses under *R. S.* 14:3–13, as am. by *L. 1949, c. 171, p. 560, sec. 1* and *L. 1950, c. 220 (N. J. S. A.* 14:3–13.1, 13.2). The Board argues that its position involves no suggestion that charitable contributions should not be made by a utility as a matter between Company and stockholder. The Board's premise in its decision and order, reiterated in its brief on this appeal, is that "in the determination of fair and reasonable rates, contributions and donations to charitable organizations are not a proper charge to operating expense."

Upon the question involved as presented by the arguments advanced by the parties we assume for the purposes of this case that charitable contributions and donations by public utility corporations are not *ultra vires.* We therefore express no opinion in this case as to the validity, scope or effect of the statutes relied upon by the Company (*R. S.* 14:3–13 *et seq., supra*) nor as to the validity of charitable gifts and donations by corporations under the common law of this State, as it is the subject matter of a pending appeal which is about to be decided in this court, namely *The A. P. Smith Manufacturing Company v. Barlow,* 13 *N. J.* 145.

It is asserted by the Board in its brief that, assuming validity of the charitable payments, they are not properly allowed as *operating* expenses to be passed on to the *consumer* in the determination of rates. The Board relies upon decisions of public utility commissions in other jurisdictions to support its position.

However, it has been held that where utility corporations have inherent or statutory power to make charitable gifts and donations, the payment is properly allowed in a rate determination as an operating expense where it has an effect upon the creation of the service or product of the corporation and therefore may be considered as reasonably necessary in the rendition of service to the consumer. *Cf. Peoples Gas Light & Coke Co. v. Slattery,* 373 *Ill.* 31, 25 *N. E.* 2d 482, 498 (*Sup. Ct.* 1940); *Denver Union Stock Yard Co. v.*

*United States,* 304 *U. S.* 470, 482–483, 58 *S. Ct.* 990, 82
*L. Ed.* 1469, 1479–1480 (1938). This appears to be a
salutary legal premise.

 It is settled in this State that the reasonableness of
an item of expense claimed by the Company must be deter-
mined in the rate proceeding. *In re New Jersey Power &*
*Light Co., supra* (9 *N. J.,* at *p.* 525) ; *Public Service Coordi-*
*nated Transport v. State, supra* (5 *N. J.,* at *p.* 222).

 The Board denied allowance upon the following abstract
statement :

 "While the Company is to be complimented for contributing to
worthy causes, such contributions, in the opinion of the Board, are
not chargeable to customers and accordingly the Company's claim
in this respect is disallowed."

 Since the Board did not dissect the items to
determine their respective relationship to functional opera-
tion of the Company, an error was made. However, the
gross amount of these items, even if allowed, is insufficient
to affect the reasonableness of the existing rates and there-
fore requires no remand in this respect. *Atlantic City*
*Sewerage Co. v. Bd. of Pub. Utility Comm'rs., supra* (128
*N. J. L.,* at *p.* 372).

 (4) *Rate Case Expenses.*

 The Board disallowed the Company's claim for allowance
as an operating expense its out-of-pocket cost forecast for
1951 of rate case expenses amounting to $108,000, for the
expressed reason that no increase in rates was determined to
be allowable. The Company includes in its questions in-
volved an assertion that this disallowance was improper. It
argues that the general practice is to allow such costs as
operating expenses if its position is not wholly without
foundation and the amount is not unreasonable.

 In *Driscoll v. Edison Light & Power Co.,* 307 *U. S.* 104,
120–121, 59 *S. Ct.* 715, 723, 83 *L. Ed.* 1134, 1145 (1939),
the United States Supreme Court held :

 "\* \* \* As the commission concluded that the prior rates of
the company were obviously excessive, it allowed nothing for ex-

pense in defending them. Consequently there is no discussion of the reasonableness of the amount of the company's charge and we accept them as reasonable. Even where the rates in effect are excessive, on a proceeding by a commission to determine reasonableness, we are of the view that the utility should be allowed its fair and proper expenses for presenting its side to the commission. We do not refer to expense of litigation in the courts. 'A different case would be here if the company's complaint had been unfounded, or if the cost of the proceeding had been swollen by untenable objections.'

In the allowance of these expenses, the period over which they are to be amortized will depend upon the character of services received or disbursements made. There could rarely be an anticipation of annually recurring charges for rate regulation. * * *"

The United States Supreme Court held that under the circumstances exhibited in the *Driscoll* case, *supra*, amortization of the rate case expenses over a ten-year period would be reasonable. While such a period would not necessarily be applicable in the present matter, we are of the opinion that if any allowance is permissible, amortization over a period of years would be mandatory on the record in this case. An adjustment in line with this thought in favor of the Company is insufficient in its result to affect the reasonableness of the existing rates and therefore in this case remand for determination of years and calculation is unnecessary. *Atlantic City Sewerage Co. v. Board of Public Utility Comm'rs., supra* (128 *N. J. L.,* at p. 372). *Cf. Driscoll v. Edison Light & P. Co., ubi supra*. No proofs relating to a proper period of amortization were introduced by the Company in the present case. Upon further proceedings, *i. e.,* new proceedings instituted under the statute for changes in the Company's rates, consideration of rate case expense items should be made upon appropriate evidence, both as to reasonableness and as to probable time of recurrence. Amortization of this factor seems to be somewhat comparable to normalization of cyclic expenses, although the "cycle" in this event is not so readily ascertainable as in the case of some categories of expense. *Cf. In re New Jersey Power & Light Co., supra* (9 *N. J.,* at pp. 529 et seq.).

(5) *Separation (interstate v. intrastate)*.

The Company's final question involved in the income expense portion of its case is whether the Board properly increased the separation factor of its toll service over private lines, resulting in a rate of return increase of 0.14%.

A "Separations Manual" was prepared by a joint committee of the Federal Communications Commission and the National Association of Railroad and Utilities Commissioners. The Manual provides:

"2. FUNDAMENTAL PRINCIPLES UNDERLYING PROCEDURES.
2.1 The following general principles underlie the procedures outlined in this manual:
2.11 Separations are made on the 'actual use' basis, which gives consideration to relative occupancy and relative time measurements."

The Company asserts it followed the procedures set forth in the Separations Manual so. that separation is based on actual use of its property and alleges that the respondent accepted its computation with the single exception of its property (and related revenues and expenses) used to furnish toll service over private lines. The Company states that, although the above adverted to Separations Manual permits "short-cut" calculations, it proved *actual* use.

The Board in its decision said:

"The Company's asserted concern for exactness in this respect would be better understood if it had insisted on comparable degrees of exactness in other aspects of its separation study which have a more significant bearing on the over-all results of separation study. We have reference here to data in Exhibit P-259 which indicates that work time used by the Company in its separation of various types of traffic work operations is that reflected in the standard system tables issued by the A. T. & T., presumably prepared by the latter company on the basis of over-all Bell system experience and not that of New Jersey Bell Telephone Company alone. Further these system work-time tables bear dates ranging from 1945 to 1949 indicating that they are based on studies in this respect made some time ago.

On this evidence the Board is impelled to the same conclusion as it reached in the 1949 proceeding, namely that the Company has wholly failed to sustain the burden of proof as to the reasonableness of the change in separation procedure aforementioned."

The Board contended on appeal that "The details of just how the Company determined its expenses associated with such toll private lines, singly or in total, was not spread upon the record."

The references in the record upon which the Company relies on this appeal do not refute the Board's contention that the Company failed to carry the burden of proof as to the reliability of its separations computation as to toll private line service.

## SUMMARY AS TO INCOME AND EXPENSES

Under the circumstances of this case we are unable to hold that error prejudicial to the rights of the Company was committed by the Board in its determination and order of August 15, 1951 relative to the expense-income factor. In this case the adjustments made by the Board constitute a relatively small change in the rate of return actually achieved on the rate base. We are satisfied that even if the Company's claims were allowed in their entirety, that rate would be neither confiscatory nor unreasonable. *Atlantic City Sewerage Co. v. Bd. Public Utility Com'rs, supra,* 128 *N. J. L.,* at p. 372. *Cf. Driscoll v. Edison Light & P. Co., supra,* 307 *U. S.* 104, 59 *S. Ct.* 715, 83 *L. Ed.,* at *pages* 1145–1146; *Dayton P. & L. Co. v. Public Utilities Commission, supra,* 292 *U. S.* 290, 54 *S. Ct.* 647, 78 *L. Ed.,* at *page* 1280. Further, the burden of proof on these items is upon the Company and it has not been borne in this case. See *In re New Jersey Power & Light Co., supra,* 9 *N. J.,* at *pp.* 526–527.

## C. RATE OF RETURN

The rate of return found to be reasonable by the Board in the 1947 and 1949 proceedings was 5.6% and the Company did not appeal in those cases. In the present case the Board found the actual indicated rate of return on the redetermined rate base ($77,836,000. larger than in the determination in 1949) to be 6.07%, increased to 6.37% after adjustment of

the income-expense factor hereinbefore discussed. This rate of return it found just and reasonable.

In this connection the question involved is whether the Board correctly applied the standards laid down by the courts of this State, viz.:

"* * * sufficient to encourage good management and furnish a reward for efficiency, to enable the utility, under efficient and economical operation, to maintain, and support its credit; and to enable it to raise money necessary for the proper discharge of its public duties." *Public Service Coordinated Transport v. State, supra,* 5 N. J., at p. 225; *Central R. Co. of N. J. v. Dept. of Pub. Utilities, supra* 7 N. J., at p. 260.

It should be added to these general principles, all of which are pertinent in the present case, that when the return under the existing rates "is within the range of reasonableness, the zone between the lowest rate not confiscatory and the highest rate fair to the public," the rates are reasonable. *In re New Jersey Power & Light Co., supra,* 9 N. J., at p. 534, citing *Public Service Coordinated Transport v. State, supra,* 5 N. J., at *page* 225; *Michigan Bell Tel. Co. v. Michigan Public Service Com., supra,* 332 Mich. 7, 50 N. W. 2d, at *pages* 838, 839. *Cf. Driscoll v. Edison Light & P. Co., supra,* 307 U. S. 104, 57 S. Ct. 715, 83 L. Ed., at *page* 1145.

The expert testimony in this case as to the rate of return which would be fair to the Company and its investors ranged from 5.25% to 8.0%. Witnesses testified to costs of debt capital applicable to this utility company ranging from 2.85% to 3.2%, cost of equity capital, 7.41% to 10% and to percentages of debt in capital structure of the Company (hypothetical, not actual) ranging from 33 1/3% to 52.8%. These experts' computations were considered and scrutinized by the Board, as the analysis expressed in its decision demonstrates.

The coordination and evaluation of expert evidence is a matter of considerable difficulty and has been committed to the Board as a body contemplated to bring an informed judgment from specialized experience to the balancing and

resolution of the complex factors involved. *Cf. D. L. & W. R. Co. v. City of Hoboken*, 10 *N. J.* 418, 425 (1952).

We see no necessity to amplify the Board's dissection of the opinion evidence in this category. Its decision reasonably demonstrates fallacies in the approach of the Company witnesses and greater reliability of the calculations employed by an intervenor's witness. The record supports its conclusions in this respect and we see no occasion to disturb them. The principal deviation appears to be in the factor of debt ratio in the capital structure of the Company. The Board's finding that the witness for the intervenor used a ratio consonant with existing and foreseeable fact has evidential support in the record. The Company argues that this factor is unsound because it is related to a temporarily distorted capital structure due to excessive post-war demand for service. See *Alabama Public Service Comm. v. Southern Bell Tel. & Tel. Co.*, 253 *Ala.* 1, 18, 22, 42 *So.* 2d 655, 669, 672 (*Sup. Ct.* 1949). A "reasonable forecast" for the future is required. The evidence in this case indicates that for the Company an excessive demand for new service continued to exist, and there was no evidence that the so-called distorted debt structure would not continue during a period reasonably forecast to be covered by the current rates. Therefore in this respect the Board did not exceed its authority in giving greater weight to the opinion evidence in question, and lesser weight to the opinion evidence based upon a hypothetical normal debt ratio. If actual inequities result, the Company may file new schedules under the statute.

### CONCLUSION

For the reasons expressed, the order of August 15, 1951 of the respondent Board of Public Utility Commissioners, Department of Public Utilities, State of New Jersey, denying the increase in rates sought by the Company in its schedules of tariff changes filed April 20, 1950, is affirmed; the respondent's order of September 18, 1952 denying rehearing is affirmed.

In view of the peculiar circumstances of this case no costs will be allowed.

HEHER, J. (dissenting). On August 15, 1951 the Board of Public Utility Commissioners determined that the "indicated rate of return under present rates for the year 1951 on the rate base found \* \* \* is clearly not insufficient"; but the Board recognized that "there are uncertainties as to the future" which defied prediction with "any degree of accuracy," and gave assurance of "necessary corrective action" under its continuing jurisdiction should "the resolution of present uncertainties result in an imposition of burdens on the Company not reflected" in the Board's judgment.

The net investment rate base was found to be $255,836,000. The operating revenue for 1951, less operating expenses, taxes and miscellaneous income deductions, was estimated at $15,-536,300, or an indicated rate of return of 6.07% on the rate base adopted by the Board. After disallowing certain claimed items of operating expense, as not deductible "in testing the reasonableness of rates," i. e., rate case expenses, charitable contributions and donations, service expense accruals, payments to the parent company for general services and licenses, the indicated rate of return on the rate base found would be 6.23%, increased to 6.37% by the Board's refusal to recognize as reasonable a change in separation procedure involving toll private line service.

On August 29, 1951 the Company interposed a petition for a rehearing, setting forth, inter alia, error in the Board's conclusions and a substantial change of circumstances, and praying for leave to present additional evidence to show, in particular, "the continuing and growing impact of inflation upon its operations," the imminence of higher tax rates imposed by the Congress, and "the continuing increase in other elements of cost," and "the effect of such increases in costs as may have occurred subsequent to the closing of the now existing record in this case," to the end that the Company "be granted such rate relief as may be just and reasonable."

On April 18, 1952, before action taken on the petition for a rehearing, the Company advised the Board, by letter, that since the Board's determination there had been a general increase in wage rates, and the federal income tax rate had been increased from 47% to 52%, effective retroactively to April 1, 1951, the "cumulative effect" of which had been "a serious impairment of the Company's financial position," and urged that the petition for a rehearing be "granted promptly and that among other things the new tax rate, the changes in separations and the increased wage rates which have resulted in impositions of burdens on the Company be reflected in the Board's decision on a rehearing." This was followed, at the instance of the Board, by a supplemental petition for a rehearing, embodying these subsequent economic changes affecting the rate of return: (a) a retroactive rise in federal income taxes, stated *supra,* increasing the Company's intrastate expenses "in an amount that could be offset by no less than $2,660,000 in additional gross revenue"; (b) changes in separation procedures, pending at the time of the Board's determination, which benefited the Company's intrastate operations "by the equivalent of $3,016,000 additional gross revenue on a going basis on the 1951 levels of business"; and (c) increases in general wage rates, at the demand of three labor unions upon wage contract expirations, which in effect "reduces this Company's earnings in an amount that could be offset by no less than $4,762,000 in additional gross revenues." It was alleged in the petition that the "cumulative result of these changes which have been resolved and which were not reflected" in the Board's decision "is to adversely affect the intrastate operations of the Company by an amount which can be offset by no less than $4,406,000 in additional gross revenue based on 1951 level of business on a going basis." Again, it was urged that the Board "promptly grant a rehearing."

The Board heard oral argument on the petition. The intervenors offered no objection to a rehearing related to economic changes occurring after the Board's determination, and to the granting of such relief "as may be just and

reasonable" in consequence of the subsequent increase in taxes and operating costs. Later on, the Board ordered the submission of "data compiled and submitted for the year 1952 similar to that reflected in Appendix 'A'" attached to the supplemental petition for a rehearing; and there was compliance with that direction.

On September 18, 1952 the petition for a rehearing was denied. The Board found that "the indicated rate of return for 1951 on the Board's Decision Basis," as shown by Appendix "A" attached to the supplemental petition for a rehearing, would have amounted to 5.54% "after allowing for the annualized effect of higher Federal Income Taxes, the changes in the separation procedures as well as the increased wages aforementioned"; but that the data submitted "also reflected the effect of lower depreciation rates which were authorized to become effective for the year 1952," and in fact indicated "a rate of return of 5.66% on the Board's Decision basis," and "neither the 1952 data submitted by the Company nor the comparable data for 1951 shown in Appendix 'A'" reflect "any savings which the Company might realize as a result of reductions in Western Electric prices effective April 1, 1952 and August 1, 1952," nor "savings which may result from allocation" to the Company "of some portion of the total savings realized by the Bell System through the filing of a consolidated income tax return."

The conclusion was that rates fixed by the Board "are operative prospectively," and the yield is a "matter of estimate," and "may be more or less than the estimated yield because of changes in operating and economic conditions," and the fact that "the yield in a given period is more or less than estimated does not of itself indicate that the rates fixed are excessive or insufficient or that the return is unfair"; that whether "an actual increase over or decrease under the estimated return and rate of return is such as to warrant action by the Board must rest in the Board's sound judgment and discretion on all of the facts before it," and it was not shown that "the indicated rate of return which may or may not prove to be the actual rate of return for the year 1952

is not within reasonable indicia of the fair rate of return" for the Company, and therefore a further hearing was not warranted at that time.

I consider this action arbitrary. Concededly, in the Company's altered economic circumstances, the reaffirmed rate of return will be substantially less than that found to be just and reasonable on the original determination. If the rate of return was just and reasonable under the circumstances existing at the time of the original determination, then it is insufficient under the Company's present economic burdens. I conceive it to have been the Board's duty to hear evidence bearing upon the adverse changes in the Company's economic position, and then to fix a rate just and reasonable under the new circumstances; and I would vacate the determination and remand the cause to that end.

It will not do to say that the Company may seek relief in a new and original proceeding. That would entail expense that would ultimately fall upon the public, and result in delay prejudicial to the Company. It is not in accordance with accepted standards of economy and efficiency in the administrative process. The Board was unsure of the immediate future; it promised "corrective action" if economic changes then not improbable eventually materialized; and the petition for a rehearing merely invoked this reserved jurisdiction.

OLIPHANT, J., concurs in this dissent.

*For affirmance*—Chief Justice VANDERBILT, and Justices WACHENFELD, BURLING and JACOBS—4.

*For reversal*—Justices HEHER and OLIPHANT—2.