119 P.2d 632

Petition of TOWN OF GRENVILLE.

Petition of COLORADO & S. RY. CO.

No. 4627.

Supreme Court of New Mexico.

Nov. 21, 1941.

E. R. Wright, of Santa Fe, O. P. Easterwood, of Clayton, and J. C. Street and J. L. Rice, both of Denver, Colo., for petitioner.

Bate Bond, of Clayton, for claimants.

BRICE, Chief Justice.

This proceeding presents the question, whether the Colorado and Southern Railway Company should continue to maintain a station agent at Grenville, a small community in Union County, New Mexico. The Railway gave local notice that the agent would be discontinued, and on November 15, 1940, Mr. W. J. Sink and others procured an order from the District Court temporarily enjoining the Company from removing the agent. Shortly thereafter Sabino Marquez et al. presented a petition to the State Corporation Commission to require the Company to continue the agency. The petition was heard by the Commission at Clayton, December 11, 1940; and on February 20, 1941 it made an order that the Railway continue to provide and maintain a station agent at Grenville until the further order of the Commission. March 10, 1941 the Colorado and Southern petitioned the Commission for an order removing the case to this Court, under Section 7 of Article XI of the State Constitution. Such order was made and, with the record, has been filed in this Court.

Section 7 of Article XI of the New Mexico Constitution provides, among other things, that the State Corporation Commission "shall have power and be charged with the duty * * * to require railway companies to provide and maintain adequate depots, stock-pens, station buildings, agents and facilities for the accommodation of passengers and for receiving and delivering freight and express."

Also:

" * * * Any company, corporation or common carrier which does not comply with the order of the commission within the time limited therefor, may file with the commission a petition to remove such cause to the supreme court, and in the event of such removal by the company, corporation or common carrier, or other party to such hearing, the supreme court may, upon application in its discretion, or of its own motion, require or authorize additional evidence to be taken in such cause. * * *

"In addition to the other powers vested in the supreme court by this constitution and the laws of the state, the said court shall have the power and it shall be its

duty to decide such cases on their merits, and carry into effect its judgments, orders and decrees made in such cases, by fine, forfeiture, mandamus, injunction and contempt or other appropriate proceedings."

The Colorado & Southern Railway Company will be designated the railway company and the citizens of Grenville will be designated petitioners.

The railway company operates a railroad that crosses the northeasterly part of the state of New Mexico. There are fourteen stations in the state, five of which are maintained with agents. The town of Grenville is 8⁷⁄₁₀ miles north of Mt. Dora and 19³⁄₁₀ miles south of Des Moines, which are the nearest stations having agents. Much of the transportation business of the community is done by truck and bus. The town is connected with paved roads or highways extending into New Mexico, Texas, Oklahoma and Colorado. There are about six or seven hundred people who are served by the post office in Grenville, approximately 190 of whom live in that town. There are two rural routes out of Grenville with 168 box owners, which serve approximately five or six hundred people, a large majority of whom trade in Grenville. The Grenville school district has an area of 300 square miles, 160 pupils attend its schools. Presumably they are transported to school by busses.

There are in Grenville two general stores, a post office, lumber yard, drug store and filling stations. The greater part of the transportation business of the community is done by truck. The principal merchant testified that 75% of the merchandise bought by him was brought to Grenville by truck; that he was in the coal business and had fifty or sixty customers, including the public schools, and that all of the coal bought by him was brought from Raton in trucks. From the small amount of local freight shipped in it would appear that even more than 75% of the commodities shipped in and out of this town, except those in carload lots, are transported by trucks.

The railway company has tabulated the income derived from the operation of this station since 1935.

The petitioners suggest, and we think correctly, that the year 1940 should be taken as a basis for calculating the income from and expense of running this station. The income for 1939 was considerably in excess of that for 1940, but this is accounted for by the fact that a large amount of material for destroying an infestation of grasshoppers was shipped into this station for use in that community. We use the first ten months of 1940 as a basis because they are the most recent figures obtainable and should show substantially the condition of traffic in and out of Grenville. There was shipped from Grenville for the year of 1940 an average of 8.6 car loads per month, or 103.6 car loads per annum. There was received at Grenville during the first ten months of 1940, from outside, 37 car loads of freight, or an average of 3.7 car loads per month, or 44.4

per annum. The outgoing car load traffic in 1940 was all livestock, consisting of 71 cars of cattle, 8 of horses, 6 of sheep and 1 of hogs. All of these, with the exception of 13 cars, were shipped during the months of August, September and October. We note from the evidence as to previous years that from 60 to 80 percent of carload traffic in each year was in the months of September, October and November. This perhaps should be taken into consideration in determining the annual outgoing carload shipments for 1940. On this basis the annual shipments would be about 107 cars.

Local freight shipped into Grenville in less than carload lots has decreased from 219 tons in 1928 to 14.2 tons in 1940 (12 tons for the first 10 months). The local freight shipped out of Grenville has decreased from 28 tons in 1930 to 1.2 tons in 1940 (one ton the first ten months.) The people of that community use trucks instead of rail transportation, apparently, whenever practical.

From tabulations in evidence we deduce the following as a fair statement of the station's business in 1940:

The revenue from outgoing traffic for the first ten months of 1940 was as follows:

| | |
|---|---:|
| 2686 cans of cream | $ 566.03 |
| 75 Railway tickets | 98.83 |
| 12 Tons of local freight | 209.38 |
| 86 Carloads of live stock | 2413.13 |
| | $3287.37 |

| | |
|---|---:|
| Total receipts for incoming freight for ten months of 1940 | 1427.37 |
| Gross income from Grenville station for ten months of 1940 | $4714.74 |

Assuming the months of November and December 1940 would average with the year, the gross 1940 income would be $5658.09, or an average of $471.51 per month.

The expense of operating the Grenville station for eleven months of 1940 was $2003.80, consisting of the following items:

| | |
|---|---:|
| Salary of agent | $1859.81 |
| Social security tax | 111.59 |
| Heating station | 32.40 |
| Total expense for eleven months of 1940 | $2003.80 |

or $182.16 per month.

But little has been added to the law on the questions involved since this court's decision, through Mr. Chief Justice Roberts, in Seward v. Denver & R. G. Ry. Co., 17 N.M. 557, 131 P. 980, 991, 46 L.R.A., N.S., 242. The facts in that case were substantially as follows: The gross revenue of the railway company for the year of 1910, from all sources, was $3507.70, and the expense of maintaining the station, including payment of $75 a month to an agent, would have been approximately $960. This court held there should be credited to the station one-half of the receipts from forwarded and received freight and all of the receipts from the sale of passenger

tickets. By this calculation the station was entitled to be credited with $2044.46. This would leave an excess of $1084.46 above the expense of maintaining the station. By the same rule of computation the station at Grenville should be credited with $2877.66 and charged with $2185.92. The total receipts for all purposes, accredited to the station is only $691.74 in excess of the cost of maintenance.

This Court, in the Seward case, said:

"Mr Seward's principal grievance was that, since the agent was discontinued, the station was what is known as a 'prepay station'; that is, freight was required to be prepaid upon all goods ordered by him. Now, are the inconveniences of a few shippers, receiving freight upon which the railroad realizes $1,850 a year, sufficient to warrant the railroad company in expending $960? We do not believe that, under the facts disclosed by the record, the requirement is reasonable. * * *

"[The Railway Company's] absolute duty is to transport freight and passengers. It is not its prime duty to provide depots, waiting rooms, station agents, telephone and telegraph facilities. These duties are only incidental to the main purpose of its organization. It might discharge its absolute duties without any of these facilities, by merely stopping its trains at designated places and loading and unloading freight and passengers. When it is called upon to perform an absolute duty, of course, the question of expense cannot be considered; but, when the duty is only an incident to

the main duty, then the question of expense becomes of more importance, and, in determining the question of reasonableness, the revenue derived by the company from the public, for whose accommodation the facility is to be furnished, becomes of importance and must be considered in connection with the public necessity. * * *

"The constitution does not confer upon the Corporation Commission the right to arbitrarily establish a station or to require a station agent regardless of the expense entailed upon the company, or the benefit to be derived by the public. It is only authorized to make such an order in this regard, as 'the public interests demand, and as may be reasonable and just.' It is not to consider alone the interests of the public affected, by the order, but must determine whether or not, taking into consideration both the interests of the public and the expense entailed upon the railroad company, the order is just and reasonable. Of course, where the question involved in this case of the safety or expedition in the operation of trains, or the performance of an absolute duty, a different proposition would be involved; but these questions are not involved."

The railway company does not propose to abandon its station at Grenville, but agrees to place in charge thereof a caretaker who will, with his family, reside in the living quarters of the station, and who will be required to give preference to the necessary railway work in caring for the business. He will be a man with a

wife whose services will be available during the caretaker's absence. He will have definite duties which (with the assistance of his wife) will be to keep the station open and heated for the use of railway patrons, during the same hours it is kept open at this time by an agent; to meet the passenger trains; to order cars for shippers by telephone through the agents at Mt. Dora or Des Moines, and to see that such orders are filled; to bill out shipments in the name of the billing agent at Mt. Dora or Des Moines, according to the direction in which the shipment moves; to notify the chief dispatcher of such shipments, who will have the train conductor pick up the cars and have them properly billed; to deliver in-bound less than carload shipments to consignees, practically the same as with an agent, except the charges must be prepaid; to receive cream and other local freight, give receipts therefor, binding on the railway, load it and return empty cans; to act as agent for the express company and deliver express in the same manner as at present; to obtain information for shippers as to when their cars and trains will arrive; take care of livestock and perform duties of that sort; notify consignees of the arrival of their cars, by mail if in the country; "take care of people, give good service and do the work right." The custodian's wife will represent him when he is absent from the station and will give receipts for freight and cream. All in-bound freight will come prepaid and will be placed by the train crews at proper places for unloading. Owners will be notified, and therefore will expect the freight and be ready to unload it. Less than car loads of freight will be placed in the warehouse under lock and key and delivered by the custodian to the consignee. No agent will be needed to sell tickets as fare can be paid on the trains at no extra cost.

If this proposal on the part of the railway company is carried out, and we understand in making this decision that it will be carried out, then we think that the citizens of Grenville have not sufficient in their favor to justify the railway company in the expenditure necessary to maintain an agent at that place. All of the freight shipped into and out of Grenville in less than car load lots for the year of 1940 was about fourteen tons, or about one-half of one large carload. This freight can be easily handled by the custodian. Very few railway tickets are sold and they can be paid for on the train without extra cost.

We think there will be no trouble regarding the shipments of cream, about which considerable is said. The freight must be prepaid, but otherwise it will be handled in the same manner as at this time. Regarding the carload shipments which are largely livestock, we have the same condition as that considered by this court in Denton Brothers v. Atchison, T. & S. F. Ry. Co., 34 N.M. 53, 277 P. 34, 36, in which the same question was an issue. This court stated:

"It seems that the only considerable inconvenience is that suffered by the two

merchants whose business is of a nature requiring frequent freight service. They no doubt do business under some disadvantages. In so far as that inconvenience affects them personally it is doubtful if it should be deemed public inconvenience. * * * We think we must here proceed upon the assumption that the persons considerably inconvenienced are few. This is 'an important factor in determining what is to be done.' * * *

"Upon the facts before us we cannot believe that an agent at Kenna would earn for the company any considerable part of his pay. Nor do we believe that he would save to the local public nearly as much as the service would cost the company and, ultimately, the general public. The company is asked to perform services which the interested parties can perform for themselves much more cheaply. Compliance with the order would result in economic waste. This will always, in cases of this kind, be an important factor in the problem, and, in the present case, we consider it the most important."

We did not consider that the $19,000 attributable to carload business at the town of Kenna contributed to much inconvenience under the system of paying the freight in advance. It was noticed that the less than carload income slightly exceeded $1300 and that the expense of running the station with an agent was $2400, a loss of $1300 annually, without taking into consideration $19,000 revenue from carload shipments. In the instant case the income from less than carload shipments is less than $1000 and the cost of maintaining an agent will be more than $2000 annually.

Obviously this station's contribution to the general expense of operations, purchase and unkeep of equipment and interest on the railway company's funded debt is substantially nil.

And finally, it may be said that Grenville is well supplied with transportation by bus and truck for most purposes, by means of which (except in carload shipments of livestock and gasoline) substantially all of the business is done. To require the company under the facts of the case to maintain an agent at Grenville would be unjust and unreasonable, and purely economic waste. See In re Denver & R. G. W. R. Co., 36 N.M. 106, 9 P.2d 139; In re Southern Pac. R. Co., 38 N.M. 325, 32 P.2d 814; Randall v. Atchison, T. & S. F. R. Co., 34 N.M. 391, 281 P. 479; San Juan Coal & Coke Co. v. Santa Fe, S. J. & N. R. R., 35 N.M. 336, 298 P. 663.

It is but just that the public bear some inconveniences rather than to impose upon the railway company the whole of this unnecessary expense. In re Southern Pac. R. Co., 37 N.M. 11, 16 P.2d 402.

The order of the district court, enjoining the railway company from dispensing with its agent, was improvidently issued and no doubt will be dissolved upon request.

The enforcement of the order of the State Corporation Commission will be denied, and

It is so ordered.

ZINN, SADLER, MABRY, and BICK-LEY, JJ., concur.