270 P.2d 685

**STATE CORPORATION COMMISSION**

v.

**MOUNTAIN STATES TEL. & TEL. CO.**

No. 5680.

Supreme Court of New Mexico.

May 8, 1954.

Rehearing Denied June 7, 1954.

Richard H. Robinson, Atty. Gen., William J. Torrington, Fred M. Standley, Asst. Attys. Gen., for appellant.

Harry L. Bigbee, Santa Fe, J. H. Shepherd, Denver, Colo., for appellee.

SEYMOUR, Justice.

On May 22, 1953, The Mountain States Telephone and Telegraph Company, appellee, filed new tariffs with the State Corporation Commission of New Mexico, appellant, substantially increasing its intrastate rates to be charged to New Mexico customers; in addition, the company advised the commission by letter that the new rates would be put into effect June 23, 1953. In conformity with all legislative and constitutional requirements, public hearing was had before the commission on the proposed increase and, on the 19th day of June, 1953, the commission published its findings and order. The operative portion of the order directed the telephone company to file a notice of withdrawal of the proposed rates not later than June 22, 1953 (one day prior to the effective date thereof) and, in any event, forbade the company to put such rates into effect.

On June 23, 1953, the company advised the commission that it would put the proposed increase of rates into effect in violation of the commission's order.

Pursuant to the duty imposed upon the commission by Art. 11, § 7, of the New

Mexico Constitution, the commission on the following day removed the matter to this Court for review.

Of incidental interest is the fact that, pursuant to the commission's petition to this Court for a restraining order against the telephone company, the company was required to and did post a bond of $1,750,000 to indemnify the customers of the company against injury by reason of the company's failure to abide by the commission's order.

Insofar as the parties are concerned, the issue before this Court is whether or not the order of the commission is just, lawful, reasonable and supported by the evidence; from our conclusion would flow this Court's order directing enforcement or forbidding enforcement of the commission's order.

 Before considering the issues submitted by the parties, there is a preliminary question of jurisdiction, disposition of which must be made. It is urged by neither party; nevertheless, as frequently stated by this Court, jurisdiction cannot be conferred by consent. McCann v. McCann, 1942, 46 N.M. 406, 129 P.2d 646; Davidson v. Enfield, 1931, 35 N.M. 580, 3 P.2d 979; Swayze v. Bartlett, 58 N.M. 504, 273 P.2d 367.

The jurisdictional question is raised by two lines of cases stemming from Art. 11, § 7, of the Constitution; it has been contended that they are in conflict in the following respect:

(1) That Seward v. Denver & R. G. R. Co., 1913, 17 N.M. 557, 131 P. 980, 46 L.R.A.,N.S., 242, stands for the right of the Supreme Court upon removal from the commission pursuant to Art. 11, § 7, supra, to determine the reasonableness and justness of the commission's order and to enforce, or forbid enforcement thereof, after a decision in the matter on the merits. This "rule" has been followed with reference to commission orders relating to station facilities and railroad rates. Kinney v. New Mexico Midland R. Co., 1923, 28 N.M. 451, 214 P. 754; Artesia Alfalfa Growers' Ass'n v. Atchison, T. & S. F. R. Co., 1928, 33 N.M. 468, 270 P. 796; John Becker Co. v. Atchison, T. & S. F. R. Co., 1930, 35 N.M. 187, 291 P. 919; San Juan Coal & Coke Co. v. Santa Fe, S. J. & N. R. R. Co., 1931, 35 N.M. 336, 298 P. 663, and 35 N.M. 512, 2 P.2d 305; In re Atchison, T. & S. F. R. Co.'s Protest of Rates, 1940, 44 N.M. 608, 107 P.2d 123; In re Southern Pac. Co., 1932, 37 N.M. 11, 16 P.2d 402; State Corp. Commission v. Atchison, T. & S. F. R. Co., 1927, 32 N.M. 304, 255 P. 394; Petition of Town of Grenville, 1941, 46 N.M. 3, 119 P.2d 632; In re Southern Pacific Co., 1934, 38 N.M. 325, 32 P.2d 814; Denton Bros. v. Atchison, T. & S. F. R. Co., 1929, 34 N.M. 53, 277 P. 34.

(2) That Seaberg v. Raton Public Service Co., 1932, 36 N.M. 59, 8 P.2d 100, stands

for the principle that the Supreme Court, upon removal from the commission pursuant to Art. 11, § 7, supra, cannot review the reasonableness of an order by the commission establishing rates in a properly conducted hearing, since the rate-making function of the commission is legislative in character, and this Court, having no legislative power, can make no rate. This purported rule has been followed with reference to electric rates and telephone rates. In re Citizens of Belen & Valencia County, 1933, 37 N.M. 165, 20 P.2d 272; State v. Mountain States Tel. & Tel. Co., 1950, 54 N.M. 315, 224 P.2d 155.

It has been suggested that these two lines of thought are in direct conflict. The reasoning, the authorities and the principles upon which these cases were determined are discussed at length in the cases themselves and a paraphrasing of them can serve no purpose. For the same reason, we do not set out Art. 11, § 7, of the Constitution which is readily available.

■ Our conclusion on this jurisdictional question in the instant case is that this Court does have jurisdiction to determine on the merits the issue posed by the parties, namely, the reasonableness of the commission's order, based upon the evidence before it, directing the withdrawal of the proposed rates. We find justification for this conclusion in the exact wording of Art. 11, § 7, supra, as it applies to the right of removal

to this court. In that regard, the language is:

"* * * in case of failure or refusal of any person, company or corporation to comply with any order within the time limit therein, unless an order of removal shall have been taken from such order by the company or corporation to the Supreme Court of this state, it shall immediately become the duty of the commission to remove such order, * * *. Any company, corporation or common carrier which does not comply with the order of the commission within the time limited therefor, may file with the commission a petition to remove such cause to the Supreme Court, * * *. Any party to such hearing before the commission, shall have the same right to remove the order entered therein to the Supreme Court of the state, as given under the provisions hereof to the company or corporation against which such order is directed."

■ It is apparent from the foregoing that every right of removal conferred by this section of the Constitution is limited to that class of cases in which the target of the regulatory power of the commission has failed or refused to comply with an order of the commission. If there is no order of the commission requiring obedience, there is no right of removal to this

Court. Further, if there is such order, but no failure or refusal (including prospective refusal) to obey such order on the part of the company, there is no right of removal to this Court.

A reconsideration of the two "conflicting" lines of authority above cited, with this general rule in mind, indicates that the conflict exists only in certain broad language used in the decisions, which language, read in this narrower sense, falls into perspective.

In the Seaberg case, the rates charged by the local company were not in issue between the commission and the company. The commission had issued no order to the company requiring obedience. Judge Watson held that the order was not removable.

Again in the Citizens of Belen case, over one hundred users of electricity and the County of Valencia joined in seeking a reduction from the commission of the rates of the New Mexico Power Company. Again there was no order issued by the commission to the company requiring obedience. Therefore, no right of removal accrued. Again, in the recent Mountain States Telephone case, new and increased rates published by the company to become effective on a certain date were approved after hearing by the commission. The state sought review by removal. There was no order requiring obedience followed by a failure or refusal of the company to obey. The commission and the target of regulation were at peace; there was no right of removal.

An examination of the cases in the other line of authority where jurisdiction was taken by this Court reveals in each case an order of the commission requiring obedience and a failure or refusal on the part of the company to obey. Comprehended in such "failure or refusal" is the right of the company, within the prescribed time limit, to remove the objectionable order to this Court for orderly review without the need of defying the commission's order. In re Southern Pac. Co., 1932, 37 N.M. 11, 16 P.2d 402, 404. This right is found in the language quoted above:

"* * * Any company, corporation or common carrier which does not comply with the order of the commission within the time limited therefor, may file with the commission a petition to remove such cause to the Supreme Court, * * *."

In the absence of removal by the company under this provision, and in the face of defiance, the commission has the duty, not the option, of removal.

In the instant case, we find the order of the commission requiring obedience and the failure and refusal to obey; the company chose in this case to defy the order. Pursuant to its constitutional duty, the com-

mission removed. Under these circumstances, we have jurisdiction to dispose of the issue tendered by the parties.

A final word on this jurisdictional question: It is the feeling of this Court that adopting the opposite conclusion, based upon the language of the Seaberg case, would be a direct evasion of the responsibility placed upon this Court by the following language of Art. 11, § 7, supra:

"* * * it shall be its (Supreme Court's) duty to decide such cases (those removed under this section) on their merits * * *." (Parentheses ours.)

We are conscious of the danger implicit in the declaration of a broad rule of thumb, such as that stated above. General rules of law can foreclose relief in proper cases which are not foreseen in the limited vision of a court's decision in a specific case. With this in mind, it might be well to state that, if this theory does not withstand the test of time and of ever increasing factual combinations, it will be necessary to explore further for a proper solution of this problem. However, this theory reconciles to our satisfaction the "conflicting" lines of authority and is supported by the soundest of those principles of law and public policy discussed at length in the cases heretofore cited.

Having determined to deal with the issue on its merits, there are certain areas of applicable law which have been settled by our prior decisions; they are:

(1) This Court, as such, is not a rate-making body; rate-making is a legislative function placed by our Constitution in the hands of the corporation commission. We do not have the power or authority to determine what a fair actual rate is. Seaberg v. Raton Public Service Co., supra. We can only determine whether an order of the commission of the character hereinafter specified, is just and reasonable and to be enforced, or the contrary. Seward v. Denver & R. G. R. Co., supra.

(2) The appeal comprehended in such a removal is not controlled by the substantial evidence rule applicable to most appeals, and in other states, frequently applicable to this exact type of case. The constitutional duty of this Court is: "* * * to decide such cases on their merits * * *." The applicable rule was stated by Justice Watson in San Juan Coal & Coke Co. v. Santa Fe, S. J. & N. R. Co., supra [35 N.M. 512, 2 P.2d 308], as follows:

"Previous decisions in rate cases have developed the rule that the commission's order or findings will not be disturbed if supported by *satisfactory* and substantial evidence." Citing In re Coal Rates in New Mexico, 23 N.M. 704, 171 P. 506; Gilliland Oil Co. v. Atchison T. & S. F. R. Co., 33 N.M.

638, 275 P. 93, 94, and cases cited above. (Emphasis ours.)

Another facet of the same rule appears in the Seward case [17 N.M. 557, 131 P. 989]:

"Passing now to the consideration of the question raised by the railway company, upon the merits of the case, we find objections interposed to certain specific findings of fact made by the Commission; the assertion being made that such findings are not supported by the evidence. While it is proper for the Commission to make findings of fact, still such findings can have no force or effect in this court. Our Constitution does not require this court to consider or give any effect to such findings, but enjoins that this court shall 'decide such cases on their merits.' It does not even, as is usually the case, make the order of the Commission prima facie just and reasonable, but, on the other hand, requires this court to pass upon the merits of the case, without indulging in any presumptions. This being true, it is our duty to take the order made by the Commission and test its reasonableness and lawfulness by the evidence adduced upon the hearing. This court forms its own independent judgment, as to each requirement of the order, upon the evidence; therefore the findings made by the Commission may not be justified by the evidence, yet if the evidence sustains the reasonableness and lawfulness of the order made it would be our duty to uphold and enforce it. * * *"

(3) No one of the many formulas from time to time used to determine a rate base such as prudent investment, original cost less depreciation, original cost, average investment, present value, current cost, or reproduction cost, is imposed by the Constitution upon the commission for use in determining rates. State v. Mountain States Tel. & Tel. Co., supra.

With the foregoing in mind, it becomes necessary first to determine the exact nature of the order before us for review. The notice for hearing stated the subject thereof as the matter of the proposed rates and changes *to determine the reasonableness, justification and lawfulness of the proposed increases*. The order concluding the hearing required the withdrawal of the proposed rates and forbade putting the same into effect. The reasonableness and justness of this order is the subject of our review. In addition to the findings contained in the document entitled Commission's Order No. 2208, there were certain statements or "findings" in the operative portion of the order, namely that the new rates were disallowed, that the lawful rates were those approved by the commission April 28, 1952 (prior to the particular hearing), and that the proposed rates "shall be illegal, null and void." Such statements

are surplusage and do not widen the scope of this review. Our question does not include whether or not the old rates are fair and reasonable. The telephone company, by choosing the method of filing a new increased tariff to be effective, and made effective, as of a definite date, and by placing that tariff in effect in violation of the commission's order, has limited our inquiry exclusively to the question of whether the commission was unreasonable in forbidding that particular proposed increase. The commission set no new rates, subjected here to our examination.

At this point, in order that the meaning of this decision may be made clear, it is necessary to emphasize the significance of the preceding paragraph. We are not dealing here with a removal by the company to this Court, which, pursuant to the opinion in the Seward case, supra, would give this Court the power to remand the cause to the commission for further action by it; nor are we dealing here with a so-called "open filing." In the case of an "open filing," the utility applies to the commission for an increase, stated usually in terms of a lump sum of dollars representing the needed additional net operating earnings. Notice is given and hearing had, a decision being based upon evidence similar to that introduced in the instant case. Frequently, the commission will not approve the total increase but will approve a lesser sum. The next step in such an approach is an order to the utility directing it to file a schedule of rates calculated to produce the approved sum. This is done, a hearing had upon the propriety of the schedule, and the rates put into effect. This course has never been followed by the telephone company in New Mexico, and the policy question involved is certainly one for management and not for this Court. However, as detailed above, in the instant case, the schedule of proposed rates was a part of the initial filing; and, having been disapproved after a hearing in which the utility demonstrated and attempted to justify the particular increase in net operating earnings, the company proceeded to put the rates into effect in defiance of the commission's order.

Two cases best illustrate and determine our conclusion on this vital point. Mr. Justice Cardozo of the Supreme Court of the United States was faced with an almost identical problem in Dayton Power & Light Co. v. Public Utilities Commission, 1934, 292 U.S. 290, 54 S.Ct. 647, 650, 78 L.Ed. 1267. He stated:

"At the threshold there is a controversy as to the scope of the problem before us for solution. The appellee argues that the only question for the commission was one as to the reasonableness of the new schedule in the very form proposed: Let the rates be excessive by ever so little, the schedule, it is said, was to be rejected alto-

gether, and no other could be substituted. In opposition the appellant urges that this is too narrow a construction of the function and powers of the commission under the applicable statute: If the proposed schedule was too high and the earlier one too low, there was a duty to fix a rate between, and thereby make the compensation adequate. We accept this broader view in the absence of a ruling to the contrary by the courts of the state. It is borne out by the terms of the bond and by the requirements of the statute under which the bond was given: Such part of the new collections as shall be found to be unreasonable, that and no more is to be refunded to the customers. It is borne out again by the findings and the order: The rate is to be returned to what it had been before the change, and the difference repaid. Finally it is borne out by the opinion of the state court, which considers upon the merits the objections enumerated by the appellant in its petition to review the order of the commission, and finds them all to be untenable."

We call attention to the sentence, "We accept this broader view in the absence of a ruling to the contrary by the courts of the state." Justice Roberts of our own Supreme Court, in Seward v. Denver & R. G. R. Co., supra, has clearly ruled to the contrary in construing the scope of the question before this Court (as distinguished from the question before the commission). He stated:

"Upon the hearing in this court it was argued by the Attorney General that this court had the right to form its own independent judgment in the matter; that it was not confined to a consideration of the reasonableness and lawfulness of the order made by the Commission, with the power to either enforce such order by its judgment, or refuse to enforce it. That the court could, for instance, in a rate case, where the Commission had fixed the rate at two cents a mile for carrying passengers, either raise or lower the rate by its judgment. That such power was conferred by the language, 'The said court shall have the power and it shall be its duty to decide such cases on their merits, and carry into effect its judgments, orders and decrees made in such cases, by fine, forfeiture, mandamus,' etc. Now, if the contention is sound, then the provision just quoted invests this court with legislative power to fix rates. * * *

\* \* \* \* \* \*

"But what is the court to decide on the merits? It is the question of the reasonableness and lawfulness of the order made by the Commission, and

whether the defendant shall be compelled to comply with such order. It is true the Constitution does not prescribe the question which the court is to decide, but we apprehend no other question could be involved. If the court finds the order reasonable and lawful, it enters a judgment to that effect and proceeds to enforce the same. If it finds it unlawful and unreasonable, it refuses to enforce it, and in such event the State Corporation Commission may proceed to form a new order, if necessary or proper, under proper rules to be prescribed by the Commission."

It is true that Mr. Justice Cardozo was dealing with the scope of the question before the commission and Justice Roberts with the question before this Court. Justice Roberts concludes the question insofar as it relates to the scope of this Court's inquiry. We do not decide finally the scope of the question before the commission because decision of that question is not required for disposition of this case. Nevertheless, it occurs to us, that under the unique constitutional provision pursuant to which our corporation commission must act, the scope of the question before the commission in each case will be determined not by a single legal construction by this Court of the meaning of the Constitution, but by the mechanical methods selected by the utility or the commission to present an issue for determination. This Court is limited in its action by the wording of the Constitution as to removal and Justice Roberts' decision as related to that wording. The corporation commission has the power to adopt rules and regulations addressed to the efficient exercise of the powers conferred upon it by the Constitution. It would seem that rules could and should be developed, calculated to frame issues before the commission usefully comprehensive in scope and to result in orders so framed that this Court's limited power of review can be used more effectively in seeking a decision just and reasonable for the parties before it.

It is on the basis of the foregoing that we limit our field of inquiry and the issues before us. Assuming the correctness of this view, it becomes unnecessary to burden this decision with an analysis in detail of many of the figures and computations in the record. While this lightens the burden on this Court, we feel impelled to say that, within the limits of our capacity, these figures and computations have been studied and reviewed in the light of other decisions of both commissions and courts struggling with the exacting problem of rate-making. The need for fully qualified men on any administrative rate-making commission is never more clearly demonstrated than by an attempt, however conscientious, of a court, unskilled and untrained in this special field, to test the reasonableness of the decision of a rate-making body.

■ The conclusion we have reached in the instant case is that the order of the commission is just and reasonable and should be enforced.

The basis for this conclusion can be explained only by a review, however brief, of the history of the litigation revolving around the regulation of the rates of public utilities. The increased flow of commission and court decisions has resulted in a vast body of authority which in turn has become the subject of review and analysis by specialists in the fields of economy and law. No purpose would be served by abstracting from individual cases or individual law review and other articles their language and reasoning. Most of the historically important cases have been reviewed at length by this Court in State v. Mountain States Tel. & Tel. Co., supra. A study of this field has developed the line of reasoning which has led to this Court's conclusion. In abbreviated form, it is as follows:

Since 1898 and the case of Smyth v. Ames, 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819, the courts and the thinking on this subject have taken a well-defined number of steps. Each step seems to have resulted in an attempt to formularize a rate-making process, and that attempt is continuing now. Basically, in our judgment, this attempt to achieve a formula, and name it, is unsound.

Smyth v. Ames, supra, resulted in the "fair value" theory. This theory has been stated in numerous ways: that the utility is entitled to a fair return on the fair value of its property, and that the fair value should be determined by reference to numerous factors among which are original cost and *reproduction cost*, that is, the cost of the plant at the time it was first dedicated to public use, and the cost of reproducing the plant at the time of valuation. As this theory developed, for several reasons the emphasis fell upon reproduction cost as a principal method of valuation. One of these reasons was a fear of the extravagance and wasted money charged to original cost in the creation of some of these enterprises. Another reason, at least on the part of the company in times of inflation, would be the magnifying of the fair value, and corresponding increase of allowable rate.

Variations of the formula of Smyth v. Ames, supra, carried through until 1944 and the case of Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333. This decision had a forecast of sorts in the 1923 dissenting opinion of Mr. Justice Brandeis in State of Missouri ex rel. South Western Bell Tel. Co. v. Public Service Commission, 1923, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807, in which he advocated a theory subsequently named the "prudent investment" theory, seeking a de-emphasis of the *value* of the property and a concentration upon the amount of capital wisely

invested, upon which investment the proper basis of return should be determined.

In the Hope case, supra, the Supreme Court rejected the fair value formula of Smyth v. Ames, supra. However, the Court did not substitute any particular formula for determining rates. It did not adopt the prudent investment theory of Mr. Justice Brandeis or any cost method of valuation. The opinion used words to the effect that the reasonableness of the end result was the true test. Regardless, however, of the fact that the Supreme Court in this case refused to formularize, we find that a formula has been superimposed upon this decision and named the "end result" theory.

In the Hope case, after the Court determined that the reasonableness of the end result was the issue before it, the decision sustained the order of the commission in reducing rates for sales of natural gas in interstate commerce on the factual basis that in this case investors were receiving returns commensurate to the returns on investments in other enterprises having corresponding risks, and that such returns were sufficient to assure confidence in the financial integrity of the enterprise so as to maintain its credit and to attract capital.

Flowing from the end result theory of the Hope case, therefore, another formula seems to have evolved from the Court's decision, namely, the "cost of capital"

theory. This theory would test the reasonableness of returns by an inquiry addressed to the following points: (1) cost of service of debt; (2) dividends comparable to like investments; (3) maintenance of credit comparable to similarly situated companies by consideration of: (a) selling price of stock; (b) ability to market stock; (c) ratio of debt to equity; and (d) surplus condition.

Broadly speaking, the commissions charged with the original regulatory power and the courts designated to review the orders of these commissions have gone through phases of development paralleling and following the formulas discussed above. After Smyth v. Ames, the commissions and the courts bent every effort toward determining a fair return upon the fair value of the company's property. As heretofore stated, the predominant note was reproduction cost value, and the work of the commissions and courts became a series of complicated mathematical computations. With the impact of the Hope case, there has been a strong trend back to valuation on the basis of original cost less conventional depreciation. This return to original cost is not as much dictated by the Hope decision as it is by the easing of the task of the commissions and courts in dealing with book figures rather than calculated figures. This Court can see no reason why it should adopt as the law of this state any single formula which has been evolved out of this

history of litigation. Historically, our economy swings like a pendulum and, depending upon the point at which the rise or fall has reached, the regulatory authorities seek a formula which will adjust rates to the immediate economic situation. Obviously, no single formula can be achieved which will successfully meet the varying needs of different economic levels.

Parenthetically, the case of Lindheimer v. Illinois Tel. Co., 1934, 292 U.S. 151, 159, 54 S.Ct. 658, 78 L.Ed. 1182, illustrates the instability of single formulas. In that case, it appears that in 1929, at the peak of an inflationary period, the traditional fair value figure was $16,000,000 in excess of book cost. Three years later in 1932, the book cost figure exceeded fair value by $15,000,000.

Such an over-simplified review of important litigation over a 50-year period is of no value to a student, but is of assistance to this Court in reaching its conclusion. We conceive it to be our responsiblity to determine promptly the exact issue before us rather than to attempt to make a major step forward in the theories of rate regulation.

Aside from the basic decisions heretofore cited and those discussed in State v. Mountain States Tel. & Tel. Co., supra, the most enlightening of the material considered by this Court is as follows: 37 Va.L. Rev. 699 (1951); 54 Col.L.Rev. 188 (1954); 45 Ill.L.Rev. 460, (1950–51); 66 Harv.L.Rev. 1274 (1952–53); Re New York Teleph. Co., 91 P.U.R.,N.S., 231.

Turning now to the record and briefs in the case before us, it is proper to recognize that in recent years the economic pendulum has climbed far up an inflationary rise. Bluntly, although not critically stated, the rates effected by the company, and the theories and evidence offered by the company to the commission in this case, were based consistently upon the principles most sympathetic and responsive to inflation. It is this fact, which we believe to be amply reflected in the evidence, that causes this Court to hold that the order of the commission was reasonable and just, and based upon satisfactory evidence.

As a first illustration, we can consider the theory upon which evidence was introduced; and this theory was the basis of the particular rates put into effect by the company.

In the first place, the justification of the effected rates, as addressed to rate of return, was based primarily upon a traditional fair value theory, Smyth v. Ames, supra, with the additional factor of estimated figures for the year of 1953. It will be recalled that the hearing took place in June, 1953. The valuation figure introduced by the company, and demanded by it, was based exclusively on reproduction cost estimated over a future period, with

the addition of figures covering telephone plant under construction, materials and supplies and cash working capital, also estimated over the year 1953.

 There is little doubt in our minds that this evidence was admissible before the commission and relevant. There is equally little doubt in our minds that the position of the company that such evidence must be the basis of the commission's determination is unsound. Based upon this approach, the company offered a present fair value figure slightly in excess of $30,000,000 (estimated 1953) addressed, of course, to the intrastate property. The company then took the old rates and earnings estimated for the year 1953 at a figure of $1,305,000, and found a return of 4.35%. Great emphasis is laid by the company upon figures of this character. For purpose of contrast, we can turn to the company's own figures for the average (estimated) year 1953 on a valuation by original cost less allocated depreciation reserve plus telephone plant under construction, material and supplies and cash working capital, as stated and estimated by them. This figure is $25,354,000. Now, instead of using the estimated earnings for 1953 under the old rate, if we apply the estimated earnings under the new rate and consider them to have been in effect for the full estimated year, we find a return of 8.33%. There is a vast difference. The company plausibly argues that the new rates will be in effect only for

one-half of the year 1953; based upon the estimate of earnings during 1953 over the period when the rates are actually in effect, there would be a return of 6.7%. However, since we are endeavoring to determine the reasonableness of an order saying in substance that these new rates are exorbitant, we can see no reason why our attention should be confined to actual earnings for one-half of 1953. Presumably, the rates will be in effect for the full year of 1954, and the argument of the company predicated upon the use of actual earnings in 1953, while they are insisting upon everything else being estimated for the full year of 1953, is mathematically plausible but, in our judgment, unsound. This approach would require that the income in the last half of 1953 replace one hundred percent the alleged deficit in earnings for the first half of 1953 without any regard to what such rates will do in 1954.

Looking for a moment at the contrast between a return of 4.35% under the old rates based upon estimated 1953 reproduction cost, and 8.33% based upon the company's own estimated 1953 original book cost, with ample allowances for construction and working capital, it is of interest to note a conclusion reached by Dr. Joseph R. Rose, the author of the 1951 Va.L.Rev. article above cited, that there are no cases known to the author in which more than 6% of traditional fair value (in which reproduction cost and original cost are both

given substantial weight) has been allowed. On the figures above cited of $30,000,000, a valuation based almost exclusively on re-production cost estimated in the future, with no substantial regard to original cost, the proposed rates over a year's period would get a return of 6.95%. When we remember that our inquiry is addressed to the question of whether or not the commission was unreasonable in directing the withdrawal of these rates, the fact that the rates indicate a return of .95% in excess of that allowed by any known court tends strongly to support the reasonableness of the commission's order.

We have no doubt that there do exist cases, using the traditional fair value formula, approving a rate of return higher than that indicated. Admittedly too, there has been a gradual increase in allowed rates of return. Nevertheless, we find very persuasive the conclusion to be drawn from this majority thinking. Some of the most recent decisions of both courts and commissions, using variations of the original cost theory, and an abbreviated statement of their conclusions are as follows: (It is imperative, of course, in the use of this comparison, to keep in mind the distinction between a *traditional* fair value rate base and an original cost rate base and the variations of these two theories of arriving at a rate base.)

New England Tel. & Tel. Co. v. State, 1953, 98 N.H. 211, 97 A.2d 213, 97 P.U.R., N.S., 410. The Supreme Court of New Hampshire here sustained 5.75% of original cost, which the commission had allowed.

Chesapeake & Potomac Tel. Co. v. Public Service Commission, 1952, 201 Md. 170, 93 A.2d 249, 97 P.U.R.,N.S., 50. The Maryland Court of Appeals sustained a commission order allowing 5.75% to 6% of a rate base slightly in excess of original cost.

New Jersey Bell Tel. Co. v. Dept. of Public Utilities, 1953, 12 N.J. 568, 97 A.2d 602, 97 P.U.R.,N.S., 297. The Court sustained the commission in rejecting a rate increase when the indicated rate of return amounted to 6.07% of original cost and to 6.37% after adjustment.

City of Fort Smith v. Southwestern Bell Tel. Co., 1952, 220 Ark. 70, 247 S.W.2d 474, 94 P.U.R.,N.S., 214. The Supreme Court of Arkansas sustained a commission allowance of 6% of prudent investment.

There are a number of recent commission decisions also of interest:

The Utah commission, December 29, 1953, authorized an increase to Mountain States Telephone & Telegraph Company. The commission used a net investment rate base and then, recognizing that in the past actual earnings had failed to produce the rate of return allowed by it and found to be reasonable, the commission projected the rate base and operating earnings forward

to December 31, 1953, and viewing the announced construction program, approved the increase in a sum calculated to yield 6.5%. Having reached the conclusion, the commission stated:

"By such procedure we believe the company should be able to earn the rate of return (approximately 6%) hereinafter found to be just and reasonable. It is to be strictly understood that in using a rate of 6.50% at this time we do not find that the company is entitled to earnings of that magnitude."

The Colorado commission on October 9, 1953, authorized Mountain States Tel. & Tel. Co. to increase rates to yield 6.69% on end of period net investment rate base.

The Arkansas commission on October 5, 1953, authorized Southwestern Bell Tel. Co. to increase rates to yield 6% on end of period net investment rate base.

We have been advised that the Washington and Oklahoma commissions in May of 1953 authorized rate increases to the particular companies involved to 6.1% on average net original cost, and 6% on net investment respectively.

In this regard, one or two other figures are of interest. The commission witnesses developed a fair value figure on the company's property on a current cost basis (comparable to reproduction cost new), which value brought forward to March 31, 1953, the latest date at which actual figures were available, was $26,260,000. This figure is not strictly comparable to the company's reproduction cost figures for a number of reasons, including disallowance of a substantial amount of working capital and a determination as of the close of the books March 31, 1953 with no estimate projected over the balance of the year. The rate of return on this figure, considering the new rates to be in effect for a year's period, would be 8.1%. Finally, the last available figures from the company's own evidence (Exhibit 30) at the close of the books on March 31, 1953, show an original cost less allocated depreciation reserve of $23,712,-363 (including plant under construction, materials and supplies and cash working capital); on the new rates, again figured over a year's period, the return would be 8.9%.

We are convinced of the unsoundness of basing valuation for rate-making purposes during this inflationary period primarily upon (1) reproduction cost new figures, and (2) an estimated period in the future as distinguished from the latest available actual figures. There is no question in our minds that this is the basis upon which the company has predicated the rate schedule now in effect in violation of the commission's order. The figures given above are solely for the purpose of reflecting in general terms the rate of return produced by this theory, and of indicating one of the

lines of reasoning which leads us to the conclusion that the commission acted reasonably in forbidding the use of the new rates.

The majority of the foregoing has been addressed to a consideration of the company's application in the light of the percentage of return upon valuation which will result from the new rates. Such analysis as we have made is addressed to the purpose of underscoring the inflationary approach of the company. With the same purpose in mind, consideration should be given to the company's statement of required net earnings for the year 1953, based upon the capital structure April 30, 1953. Such consideration revolves about the cost of capital theory.

The first item (Company's Exhibit 20) is $2,342,000 addressed to interest charges on $60,000,000 actual debenture bonds, and on slightly over $20,000,000 so-called "average" short-term loans at 3.25% interest. This raises an interesting query: The testimony shows that, as of April 30, 1953, the company's debt ratio was 21.6% (disregarding short-term loans) which, of course, would leave the ratio of equity capital at 78.4%. It was admitted that this is a very favorable and conservative ratio as to debt. The company contends that an ideal debt ratio for the Bell system as a whole is one-third. It is further stated that, because the operating company is a part of the Bell system, an allowance should be made for this company's share of the overriding debentures of American Telephone & Telegraph Company, the parent corporation, which would raise the ratio of the company to around the desired one-third debt ratio. Adding the estimated average short term loans for 1953 would raise the ratio to 40%.

The problem is this: Debt capital is substantially less expensive to the operating company than equity capital: (a) the amount paid for debt capital is less than one-half that paid for equity capital, and (b) interest on debt is a deductible expense in determining tax liability while dividends on stock are not deductible. Therefore, while no debt at all would seem the ideal, it would require, under our present economy, a great increase in earnings (i. e., rates) to sustain such a position. By the same token, a very heavy debt ratio of 60% or 70% would result in cheaper useable money for the company and presumably lower rates, but would destroy public confidence in the enterprise and, in the face of a disaster like that of 1929, would put the company in a very dangerous position. The railroad history of 1929 reflects the hazard of cheap financing by a too-high debt ratio. There is much theoretical argument as to whether rates should be based upon actual debt ratio or an estimated proper debt ratio, and again it is the belief of this Court that such a determination depends upon the eco-

nomic facts relevant at the time of decision. Be this as it may, the existing decisions of both commissions and courts, and comparisons with other enterprises indicate that the desired one-third debt ratio of the Bell telephone system errs, if at all, on the conservative side and, while economists disagree, responsible ones argue that a debt ratio up to 50%, taking into consideration the debentures of American Tel. & Tel. and the present expansion program, would not jeopardize public confidence. In any event, we find here only a 28% debt ratio (including average short-term loans) for this operating company, and a 40% ratio taking into consideration this company's share in the American Tel. & Tel. debt burden. Debt ratio is strictly a matter for management, but its evalution in fixing rates is an item for serious consideration by the rate-making body. The ratio being what it is in this case again weights the figures presented in favor of the company for the proposed increase.

The second item of $15,592,000 provides for an annual dividend of $8 per share ($100 par value) on outstanding stock. There are several ideas of interest in this connection. Historical record of the company for 37 years shows that an $8 dividend was paid in only 11 of those years and never a higher dividend. During 10 of these years, the dividend was $6 or less, and the balance of the years, at approximately $7 a share. The period in which the $8 dividend commenced was in 1927 as the economic pendulum rose toward its highest point of inflation.

It is also interesting to note the action of the Public Utilities Commission of Colorado in its decision dated October 9, 1953 dealing with the rates of this same company. When faced with a similar request based on very similar testimony, the Colorado commission determined that a $6 annual dividend was sufficient. Similarly, it is our understanding of the December 29, 1953 decision of the Utah commission faced with a request for an $8 dividend based upon a 70% dividend payout, that the Utah commission felt this to be exorbitant. Since these commissions were faced with the actual problem of rate-making, the analysis leading to this conclusion is incorporated and available in those decisions. As of now, the conclusions there reached on this particular item seem sound to this Court, particularly in the light of the following item addressed to retained earnings.

Item 3 relates to retained earnings and shows $7,310,000 after about a 68% dividend payout. In this connection, the evidence of the company shows a specific need for more surplus and a greater amount of retained earnings than it has been able to accumulate in recent years. However, a number of things are apparent in this regard. First, over a 31-year period, American Tel. & Tel., the parent corporation, had

an average payout of approximately 91.1%. That company, during the greater part of the time, was one of the 50 blue ribbon stocks and was paying a $9 dividend. Its financial stability has been such as to take on the character of being a proper investment for the most conservative trusts, that is, the characteristics of a fixed income security. The parent corporation, by virtue of its ownership of all or the majority of stock in the operating companies, is in a position to dictate not only its own dividend policies, but those of the operating companies. Its eminently successful operation with average retained earnings over 31 years of 8.9%, suggests that a dividend payout of only 68% for this operating company, on proposed earnings that would allow a dividend of $8 per share, would overemphasize the interest of the stockholders of the company to a point which almost ignores the consumer, the public, to whom the commission owes an equal obligation. On a more generalized plane, it is interesting to note that the company's Exhibit 16, being entitled Financial Data Relating to Fair Return, and addressed to the whole company, shows at least a slightly increased percent of retained earnings in 1952 over 1951, and further shows a steady reduction in the debt ratio from a point of 53.25% in 1947 to 37.36% in 1952, which has been even further improved in 1953 according to the testimony of the company. In short, recent prior rate increases in New Mexico

and other states in which this company operates, are already improving the company's position along these lines.

The foregoing ideas are addressed to the capacity of the company on a competitive basis to procure equity capital upon reasonable terms. In its Exhibit 15, the company has laid great emphasis on the fact that in the 1930 stock issue, 96.6% of stock offered to the public was subscribed; that in the 1946 issue the equivalent figure was 96.3%; and that in the annual issues from 1948 through 1953 inclusive, only 38.7% of the public offer was subscribed. Not emphasized is the fact that in the past two years, substantial increases have been allowed in a number of the states served by the company in addition to three increases in New Mexico alone; and that without the increase here involved, 89% of the public offer was subscribed in the 1953 issue. Further, the current asked and bid prices on the Denver exchange are substantially above par, a necessary factor for a successful issue, and a factor not present in the offerings between 1948 and 1952.

Along the same lines and, although by no means conclusive of the question before us, the auditors' report for the commission (Commission's Exhibit No. 3) covering the calendar year 1952 shows certain comparisons of total states within the operations of the Mountain States Telephone and Telegraph Company. The net operating earn-

ings per telephone in New Mexico for that year were $13.69, the second highest of the eight states, some $4.31 or 31% higher than the total company average; and in the ratio of net operating earnings to average plant in use and average investment, New Mexico exceeded or equalled all other states and in 1952, was appreciably higher than the total company figures. There further appears in this audit a showing that for each individual year from 1948 through 1952, the dollar net operating earnings per telephone in New Mexico substantially exceeded the dollar net operating earnings per telephone of the company as a whole.

It is certainly true that an unreasonable result in other states would not serve to make reasonable an unreasonable result in New Mexico. However, a consideration of the successful operations of the parent corporation and the operating company, and a finding that New Mexico in most respects leads in earnings among the eight states served by this operating company, both support the reasonableness of the decision of the commission in ordering the withdrawal of the new rates involving an increase of substantially 40%.

In partial summary, up to this point we have discussed first, our disapproval of the basis of valuation demanded by the company, namely, reproduction cost new projected over a future period, and, second, our conclusion that the aims of the company in seeking to justify their required net earnings are concentrated on the welfare of the stockholders to the exclusion of the interests of the consumers. And, as a corollary to the last conclusion, we have called attention to the fact that New Mexico consumers, under the old rates after three increases, are carrying a greater share of the total company burden than the other seven states (with one possible exception) served by this operating company.

Knowing that the financial welfare of the company is in itself a matter of ultimate interest to the New Mexico consumer, and in an effort to test in a general way our conclusion in the instant case, we digress briefly to discuss certain specific problems in rate-making peculiar to the Bell system.

The system is composed of American Telephone & Telegraph Company, the Western Electric Company, and 22 associated operating companies, among which is Mountain States Telephone & Telegraph Company. The parent corporation controls the entire system, owning all or a majority of stock of 19 of the associated companies, a substantial minority in the other three, and all or almost all of the stock of Western Electric. Western Electric is the manufacturing and supply agency of the system. American, itself, supplies expert services of various kinds to the associated companies under a license agreement and, further, through its long lines division, fur-

nishes long distance interstate telephone services with the collaboration of the asso-ciated companies.

In determining the reasonableness of the commission in forbidding the use of the new rates, three problems peculiar to the organization of the Bell system have at least a bearing upon the figures furnished by the operating companies to the state commissions, on which figures fair rates must be established.

The three basic telephone services are local exchange, intrastate toll and interstate toll. As stated by Dr. Joseph R. Rose in the above cited Va.L.Rev.:

"Interstate calls originate and terminate on the same equipment used by the associated companies in rendering intrastate services; * * * intrastate services and rates are subject to regulation by the state commissions while interstate operations are within the exclusive jurisdiction of the Federal Communications Commission. In regulating intrastate returns, therefore, the state commissions must segregate intrastate from interstate property and expenses. This process is commonly designated as separation."

This separation has been one of the most difficult areas in which state commissions are required to move. A separations manual has been prepared and put into general use by the telephone companies and the Federal Communications Commission, and has been generally accepted by the state commissions. The development by our commission of their own separations manual is almost a practical impossibility at this time. Therefore, the commission must accept in substance the separation formulas handed them by the telephone company. We mention this only because the consensus of opinion is to the effect that the formulas of the manual are unfair to the intrastate units. As one example of this, it is generally true that the earnings on interstate toll have shown a higher rate of return than has intrastate toll. Moreover, the history of state commissions in recent years has shown a continual application for and granting of increases in intrastate rates, whereas, at least until recently, the Federal Communications Commission was considering a lowering of rates on an interstate basis. This situation becomes more understandable when we disregard the corporate fiction and recognize that American Tel. & Tel., the parent corporation, owns the majority of the stock of the operating company and has, as one part of its own organization the profitable long lines department. Simply stated, the result would be increased earnings to the parent corporation by having the subsidiary intrastate units carry more than their fair share of the expense of interstate operations. We cannot ask our commission now to investigate with particularity this phase of the

question. Indeed, our commission has no power to require production of the books and figures of the parent corporation; nevertheless, this Court may consider the weight of informed judgment that, in this area, the intrastate figures produced by the company are weighted in favor of higher rates.

The Separations Manual discussed above is one of the problems in rate-making peculiar to the Bell system. There are two others; one of these is the determination of fair or reasonable compensation for services furnished the associated companies by American Tel. & Tel., the parent corporation, under a license contract. The payment for services under this contract is at the approximate rate of one percent of the gross local and toll service revenues. There is substantial evidence that the benefits received by associated operating companies are worth this amount to the associated companies. Assuming this, a part of that contract is an agreement that the parent company maintain a centralized pool of funds from which the operating companies may obtain loans when they need cash. Loans are available on request for repayment at any time, with a current rate of interest at 3.25%. In the figures offered by the company, working capital was included in the company's valuation of its property at a substantial figure and, as best we are able to determine, on the basis of the New Mexico unit operating alone.

It may well be that this is a proper accounting practice and a sound business practice; nevertheless, it remains a fact that this New Mexico operation need not have in the bank at any given time any actual number of dollars. The availability of working capital from the parent corporation on the terms specified in the license contract certainly raises the question of whether there should be figured in the rate base the total amount of working capital that would be required by a single unassociated corporate venture. Some commissions exclude working capital from the rate base. Our commission, in its figures, drastically reduced the amount claimed as working capital. However, in all of the figures, save one, of those used above, the company's figure for working capital was included. Here, again, we are entitled to be conscious of the weighting of this item in favor of the company.

In the Bell system, one of the associated corporations is Western Electric, which manufactures and sells to the operating company all of its equipment. Evidence produced by the company would indicate that the prices paid are fair and that the earnings of Western Electric, owned in its entirety by the parent corporation, American Tel. & Tel., are reasonable. It is possible that this should conclude any question on this point. Nevertheless, here again the parent corporation has all of the earnings of a subsidiary, which subsidiary

in turn has a "guaranteed" customer and the customer has a complete monopoly on the end product. There is no doubt that this arrangement is beneficial to both the operating company and to the parent. The same is true of the availability of operating capital discussed above. Nevertheless, we are not required to close our eyes to the fact that the health and earnings of the parent company are related to a determination of fair rates for the New Mexico operation. Again stating a conclusion in very general terms, there seems to be a conflict between the financial standing, strength and integrity of American Tel. & Tel., and the current applications by its operating companies in every state in the union for increased rates from intrastate properties, with emphasis on the proposition that their property is being confiscated. The standing of the parent corporation and the program of expansion, which is enormous in size and being currently followed, are not in harmony with the claim of confiscation.

This company has been before the commission on three different occasions, in 1947, 1949 and 1951, applying for and getting rate increases. The present increase is just under 40%. Historically, if for no other reason, this application would give pause to the commission and, unless it is the obligation of the commission to protect the company against the impact of inflation, such an increase deserves the closest scrutiny.

Going further along general lines, the company's exhibits show an enormous expansion program which has resulted in an increase of the telephone plant of the company as a whole of well over 100% between 1946 and 1952. New Mexico has had at least its proportionate share of this growth. In the rate base offered by the company bottomed on the estimated average year 1953, there has been included planned construction. Of course, this is management's problem and the construction can be performed or not, pursuant to management's best judgment. We question, however, the right of the company to call upon the customer to finance this proposed construction exclusively upon the basis of the decision of management. It is true that this public utility is required by law to furnish adequate and efficient service to the public. It is also true that the fast growth of New Mexico has required a great expansion of the company's services. We do not believe, however, that unlimited expansion, even in the name of service, is required by this law. Obviously, the company is not required by law to furnish telephone service to some individual who chooses to settle in such a remote spot that the income from service furnished will have no relation to the investment of the company. We do not say that the expansion of the company has not been reasonable; we do say that management has the responsibility of measuring its expansion and limiting it with regard to

many factors, among which are the interests of present consumers as well as those of stockholders, and with an eye to the economic future. It is interesting to note that the year in which the $8 dividend per share was being paid by the company was one of the eras of its slowest expansion, and that the lowest dividends paid have been during an era of greatest expansion.

There are perhaps two principal concepts which cause this Court to enforce the order of the commission. The first has been well expressed in the decision of the New York Public Service Commission in Re New York Teleph. Co., supra, as follows:

"There is a still more fundamental approach to this problem. The company's economic witnesses argue—and correctly—that inflation is dangerous to the economy of the country; and they state that there are certain privileged classes who have been insulated against its effects—notably labor and the farmer. They would add to these claimed privileged classes another, that is the investor in utility equities. The solution to the problem is not in creating privileged classes. It is in treating all alike. If it were within our power to insure utility investors against inflation, we would simply create a class (according to the company's testimony, another class) who

would have no interest in combating it and who might even profit by it. As a matter of elemental justice, consumers of utility services are entitled to the same protection against inflation produced by governmental policies as are utility owners."

The second concept may be simply stated: That, while the return for the utility should be sufficient to enable it to obtain funds in the capital markets in competition with other businesses of like risk, that return should be no greater than necessary for that purpose. In our judgment, the rates effected by the company are greater than necessary.

In view of this Court's approach to the particular case, it becomes of the greatest importance to state in conclusion certain principles. A failure to do so opens the door to a misuse and misapplication of the ideas heretofore expressed.

Our investigation has been addressed solely to the question of whether there was satisfactory evidence to support the reasonableness and justness of the commission's order in directing a withdrawal of the increased tariffs. Specifically, it has not been addressed to the question of what constitutes a fair rate. The distinction is more than one of words. Had the reasonableness of the old rates been among the questions presented, it would have been necessary to consider and test many figures.

and computations included in the record but omitted in this decision. Further, the very nature of calculating a fair rate would strictly limit the rate-making body, and perhaps this Court, in its consideration of many of the general ideas which in part support the conclusion of this Court on the question submitted to it.

Improperly interpreted, this opinion might be considered an attack upon and condemnation of the company by reason of its association with the Bell system or, otherwise stated, an attack upon big business. On the contrary, the benefits accruing by this association to the operating companies, to their stockholders, and to the general public, the customers, are readily apparent. A commission or court with a punitive attitude toward the size and strength of the Bell system could not perform its statutory or constitutional duties. In this regard, the record reflects such a punitive attitude in some of the proceedings before the commission and, had the question posed been a different one, it might well have led the commission to an erroneous conclusion. However, the consideration given in this opinion to the Bell system as a whole is based upon this fact: That American Tel. and Tel., by virtue of its ownership of stock in the operating companies, Western Electric (supplies), and its ownership of the long lines segment of its telephone business, is able to control the fiscal policies of the operating companies. To say that this Court, in answering the question presented, is bound by the corporate fiction and cannot look beyond the boundary of New Mexico, is an arbitrary limitation which we will not accept.

Further, in fairness to the company, it is appropriate to say that there is grave doubt in our minds as to the adequacy of the old rates and the fairness of the commission's findings that such rates are adequate. In our judgment, the commission erred in a number of respects. It used the calendar year 1952–1953 as the test period and almost completely ignored the latest actual figures as of March 31, 1953. It gave less than adequate consideration to estimates for the last three-fourths of 1953. There were other errors. Parenthetically, the commission may have erred in favor of the company in its handling of property under construction and interest during construction as incorporated in determining a rate base. There is danger of allowing a double return in handling these figures. Thorough analysis of this problem appears 37 Va.L.Rev. 708–709. However, the question of whether or not the old rates are confiscatory is not presented to us here. By reason of the mechanics of this removal, the question of confiscation here can assist the company only if we should determine that anything less than the rates effected by the company is confiscatory. We do not find this to be true. We are aware of the narrowness of the question to which

we have limited our consideration. In our own minds it is not only justified by the terms of the constitutional provision, but it is necessary because of the results that would flow from a different interpretation of the scope of the question before us. If we considered the reasonableness or confiscatory nature of the old rates in the instant case as it comes to us on removal, not by the company but by the commission, nonenforcement of the order would result in the capture for all time of the moneys collected by the company under increased rates (regardless of the amount thereof) put into effect in defiance of the commission's order. Had the company removed, this Court would have had greater flexibility of action. In such case, " * * * the Supreme Court may, upon application in its discretion, or of its own motion, require or authorize additional evidence to be taken in such cause; but in the event of removal by the commission, upon failure of the company * * *, no additional evidence shall be allowed." Art. 11, § 7, N.M.Const.

In view of the foregoing, it is the judgment of this Court that the commission's order be enforced and that the company be required to comply therewith within 30 days from the filing of this opinion; and it is further ordered that said company be and it hereby is ordered to refund, either by credit or in cash, to the telephone users in this state the amount of the difference in rates and charges for telephone service between the schedule in effect immediately prior to June 23, 1953, and the schedule of rates put into effect on June 23, 1953.

It is so ordered.

McGHEE, C. J., SADLER and COMPTON, JJ., and FEDERICI, D. J., concur.

LUJAN, J., not participating.